# UNITED STATES *v.* PAYNER

No. 78–1729.  Argued February 20, 1980—Decided June 23, 1980

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, REHNQUIST, and STEVENS, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 737. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and BLACKMUN, JJ., joined, *post*, p. 738.

*Solicitor General McCree* argued the cause for the United States. With him on the brief were *Assistant Attorney General Ferguson, Robert E. Lindsay,* and *James A. Bruton.*

*Bennet Kleinman* argued the cause for respondent. With him on the brief were *Bernard J. Stuplinski* and *Michael H. Diamant.*

MR. JUSTICE POWELL delivered the opinion of the Court.

The question is whether the District Court properly suppressed the fruits of an unlawful search that did not invade the respondent's Fourth Amendment rights.

I

Respondent Jack Payner was indicted in September 1976 on a charge of falsifying his 1972 federal income tax return in violation of 18 U. S. C. § 1001.[1] The indictment alleged that respondent denied maintaining a foreign bank account at a time when he knew that he had such an account at the Castle Bank and Trust Company of Nassau, Bahama Islands. The Government's case rested heavily on a loan guarantee agreement dated April 28, 1972, in which respondent pledged

---

[1] Title 18 U. S. C. § 1001 provides in relevant part:

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully . . . makes any false, fictitious or fraudulent statements or representations, . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both."

the funds in his Castle Bank account as security for a $100,000 loan.

Respondent waived his right to jury trial and moved to suppress the guarantee agreement. With the consent of the parties, the United States District Court for the Northern District of Ohio took evidence on the motion at a hearing consolidated with the trial on the merits. The court found respondent guilty as charged on the basis of all the evidence. The court also found, however, that the Government discovered the guarantee agreement by exploiting a flagrantly illegal search that occurred on January 15, 1973. The court therefore suppressed "all evidence introduced in the case by the Government with the exception of Jack Payner's 1972 tax return . . . and the related testimony." 434 F. Supp. 113, 136 (1977). As the tax return alone was insufficient to demonstrate knowing falsification, the District Court set aside respondent's conviction.[2]

The events leading up to the 1973 search are not in dispute. In 1965, the Internal Revenue Service launched an investigation into the financial activities of American citizens in the Bahamas. The project, known as "Operation Trade Winds," was headquartered in Jacksonville, Fla. Suspicion focused on the Castle Bank in 1972, when investigators learned that a suspected narcotics trafficker had an account there. Special Agent Richard Jaffe of the Jacksonville office asked Norman Casper, a private investigator and occasional informant, to learn what he could about the Castle Bank and its depositors. To that end, Casper cultivated his friendship with Castle

---

[2] The unusual sequence of rulings was a byproduct of the consolidated hearing conducted by the District Court. The court initially failed to enter judgment on the merits. At the close of the evidence, it simply granted respondent's motion to suppress. After the Court of Appeals for the Sixth Circuit dismissed the Government's appeal for want of jurisdiction, the District Court vacated the order granting the motion to suppress and entered a verdict of guilty. The court then reinstated its suppression order and set aside the verdict. Respondent does not challenge these procedures.

Bank vice president Michael Wolstencroft. Casper introduced Wolstencroft to Sybol Kennedy, a private investigator and former employee. When Casper discovered that the banker intended to spend a few days in Miami in January 1973, he devised a scheme to gain access to the bank records he knew Wolstencroft would be carrying in his briefcase. Agent Jaffe approved the basic outline of the plan.

Wolstencroft arrived in Miami on January 15 and went directly to Kennedy's apartment. At about 7:30 p. m., the two left for dinner at a Key Biscayne restaurant. Shortly thereafter, Casper entered the apartment using a key supplied by Kennedy. He removed the briefcase and delivered it to Jaffe. While the agent supervised the copying of approximately 400 documents taken from the briefcase, a "lookout" observed Kennedy and Wolstencroft at dinner. The observer notified Casper when the pair left the restaurant, and the briefcase was replaced. The documents photographed that evening included papers evidencing a close working relationship between the Castle Bank and the Bank of Perrine, Fla. Subpoenas issued to the Bank of Perrine ultimately uncovered the loan guarantee agreement at issue in this case.

The District Court found that the United States, acting through Jaffe, "knowingly and willfully participated in the unlawful seizure of Michael Wolstencroft's briefcase. . . ." *Id.,* at 120. According to that court, "the Government affirmatively counsels its agents that the Fourth Amendment standing limitation permits them to purposefully conduct an unconstitutional search and seizure of one individual in order to obtain evidence against third parties. . . ." *Id.,* at 132–133. The District Court also found that the documents seized from Wolstencroft provided the leads that ultimately led to the discovery of the critical loan guarantee agreement. *Id.,* at 123.[3] Although the search did not impinge upon the

---

[3] The United States argued in the District Court and the Court of Appeals that the guarantee agreement was discovered through an independent investigation untainted by the briefcase search. The Government also

respondent's Fourth Amendment rights, the District Court believed that the Due Process Clause of the Fifth Amendment and the inherent supervisory power of the federal courts required it to exclude evidence tainted by the Government's "knowing and purposeful *bad faith hostility* to any person's fundamental constitutional rights." *Id.,* at 129; see *id.,* at 133, 134–135.

The Court of Appeals for the Sixth Circuit affirmed in a brief order endorsing the District Court's use of its supervisory power. 590 F. 2d 206 (1979) (*per curiam*). The Court of Appeals did not decide the due process question. We granted certiorari, 444 U. S. 822 (1979), and we now reverse.

## II

This Court discussed the doctrine of "standing to invoke the [Fourth Amendment] exclusionary rule" in some detail last Term. *Rakas* v. *Illinois,* 439 U. S. 128, 138 (1978). We reaffirmed the established rule that a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights. *Id.,* at 133–140. See, *e. g., Brown* v. *United States,* 411 U. S. 223, 229–230 (1973); *Alderman* v. *United States,* 394 U. S. 165, 171–172 (1969); *Simmons* v. *United States,* 390 U. S. 377, 389 (1968). And the defendant's Fourth Amendment rights are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party. *Rakas* v. *Illinois,* 439 U. S., at 143; *id.,* at 149–152 (POWELL, J., concurring); *Combs* v. *United States,* 408 U. S. 224, 227 (1972); *Mancusi* v. *DeForte,* 392 U. S. 364, 368 (1968).

The foregoing authorities establish, as the District Court recognized, that respondent lacks standing under the Fourth

---

denied that its agents willfully encouraged Casper's illegal behavior. For purposes of this opinion, we need not question the District Court's contrary findings on either point.

Amendment to suppress the documents illegally seized from Wolstencroft. 434 F. Supp., at 126. The Court of Appeals did not disturb the District Court's conclusion that "Jack Payner possessed no privacy interest in the Castle Bank documents that were seized from Wolstencroft." *Ibid.;* see 590 F. 2d, at 207. Nor do we. *United States* v. *Miller,* 425 U. S. 435 (1976), established that a depositor has no expectation of privacy and thus no "protectable Fourth Amendment interest" in copies of checks and deposit slips retained by his bank. *Id.,* at 437; see *id.,* at 442. Nothing in the record supports a contrary conclusion in this case.[4]

---

[4] We are not persuaded by respondent's suggestion that the Bahamian law of bank secrecy creates an expectation of privacy not present in *United States* v. *Miller,* 425 U. S. 435 (1976). At the outset, it is not clear that secret information regarding this respondent's account played any role in the investigation that led to the discovery of the critical loan guarantee agreement. See *supra,* at 730. Even if the causal link were established, however, respondent's claim lacks merit. He cites a provision, 1909 Bah. Acts, ch. 4, that is no longer in effect. Bank secrecy is now safeguarded by § 19 of the Banks Act, Bah. Islands Rev. Laws, ch. 96 (1965), as added, 1965 Bah. Acts, No. 65, which provides in relevant part:

"(1) Except for the purpose of the performance of his duties or the exercise of his functions under this Act or when lawfully required to do so by any court of competent jurisdiction within the Colony or under the provisions of any law, no person shall disclose any information relating to the affairs of . . . the customer of a bank which he has acquired in the performance of his duties or the exercise of his functions under this Act."

See also the Banks and Trust Companies Regulation Act, 1965 Bah. Acts, No. 64, § 10, as amended, 1968 Bah. Acts, No. 34, 1969 Bah. Acts, No. 20, 1971 Bah. Acts, No. 15. The statute is hardly a blanket guarantee of privacy. Its application is limited; it is hedged with exceptions; and we have been directed to no authority construing its terms. Moreover, American depositors know that their own country requires them to report relationships with foreign financial institutions. 31 U. S. C. § 1121; 31 CFR § 103.24 (1979). See generally *California Bankers Assn.* v. *Shultz,* 416 U. S. 21, 59–63, 71–76 (1974). We conclude that respondent lacked a reasonable expectation of privacy in the Castle Bank records that documented his account.

The District Court and the Court of Appeals believed, however, that a federal court should use its supervisory power to suppress evidence tainted by gross illegalities that did not infringe the defendant's constitutional rights. The United States contends that this approach—as applied in this case—upsets the careful balance of interests embodied in the Fourth Amendment decisions of this Court. In the Government's view, such an extension of the supervisory power would enable federal courts to exercise a standardless discretion in their application of the exclusionary rule to enforce the Fourth Amendment. We agree with the Government.

## III

We certainly can understand the District Court's commendable desire to deter deliberate intrusions into the privacy of persons who are unlikely to become defendants in a criminal prosecution. See 434 F. Supp., at 135. No court should condone the unconstitutional and possibly criminal behavior of those who planned and executed this "briefcase caper." [5]

---

[5] "The security of persons and property remains a fundamental value which law enforcement officers must respect. Nor should those who flout the rules escape unscathed." *Alderman* v. *United States,* 394 U. S. 165, 175 (1969). We note that in 1976 Congress investigated the improprieties revealed in this record. See Oversight Hearings into the Operations of the IRS before a Subcommittee of the House Committee on Government Operations (Operation Tradewinds, Project Haven, and Narcotics Traffickers Tax Program), 94th Cong., 1st Sess. (1975). As a result, the Commissioner of Internal Revenue "called off" Operation Trade Winds. Tr. of Oral Arg. 35. The Commissioner also adopted guidelines that require agents to instruct informants on the requirements of the law and to report known illegalities to a supervisory officer, who is in turn directed to notify appropriate state authorities. IR Manual §§ 9373.3 (3), 9373.4 (Manual Transmittal 9–21, Dec. 27, 1977). Although these measures appear on their face to be less positive than one might expect from an agency charged with upholding the law, they do indicate disapproval of the practices found to have been implemented in this case. We cannot assume that similar lawless conduct, if brought to the attention of

Indeed, the decisions of this Court are replete with denunciations of willfully lawless activities undertaken in the name of law enforcement. *E. g., Jackson* v. *Denno,* 378 U. S. 368, 386 (1964); see *Olmstead* v. *United States,* 277 U. S. 438, 485 (1928) (Brandeis, J., dissenting). But our cases also show that these unexceptional principles do not command the exclusion of evidence in every case of illegality. Instead, they must be weighed against the considerable harm that would flow from indiscriminate application of an exclusionary rule.

Thus, the exclusionary rule "has been restricted to those areas where its remedial objectives are most efficaciously served." *United States* v. *Calandra,* 414 U. S. 338, 348 (1974). The Court has acknowledged that the suppression of probative but tainted evidence exacts a costly toll upon the ability of courts to ascertain the truth in a criminal case. *E. g., Rakas* v. *Illinois,* 439 U. S., at 137–138; *United States* v. *Ceccolini,* 435 U. S. 268, 275–279 (1978); *Stone* v. *Powell,* 428 U. S. 465, 489–491 (1976); see *Michigan* v. *Tucker,* 417 U. S. 433, 450–451 (1974).[6] Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury. *E. g., Stone* v. *Powell, supra,* at 485–489; *United States* v. *Calandra, supra,* at 348. After all, it is the defendant, and not the constable, who stands trial.

The same societal interests are at risk when a criminal defendant invokes the supervisory power to suppress evidence seized in violation of a third party's constitutional rights. The supervisory power is applied with some caution even

---

responsible officials, would not be dealt with appropriately. To require in addition the suppression of highly probative evidence in a trial against a third party would penalize society unnecessarily.

[6] See also *Kaufman* v. *United States,* 394 U. S. 217, 237–238 (1969) (Black, J., dissenting); Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 736–746, 755–756 (1970).

when the defendant asserts a violation of his own rights.[7] In *United States* v. *Caceres,* 440 U. S. 741, 754–757 (1979), we refused to exclude all evidence tainted by violations of an executive department's rules. And in *Elkins* v. *United States,* 364 U. S. 206, 216 (1960), the Court called for a restrained application of the supervisory power.

> "[A]ny apparent limitation upon the process of discovering truth in a federal trial ought to be imposed only upon the basis of considerations which outweigh the general need for untrammeled disclosure of competent and relevant evidence in a court of justice." *Ibid.*

See also *Nardone* v. *United States,* 308 U. S. 338, 340 (1939).

We conclude that the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court. Our Fourth Amendment decisions have established beyond any doubt that the interest in deterring illegal searches does not justify the exclusion of tainted evidence at the instance of a party who was not the victim of the challenged practices. *Rakas* v. *Illinois, supra,* at 137; *Alderman* v. *United States,* 394 U. S., at 174–175.[8]

---

[7] Federal courts may use their supervisory power in some circumstances to exclude evidence taken from the *defendant* by "willful disobedience of law." *McNabb* v. *United States,* 318 U. S. 332, 345 (1943); see *Elkins* v. *United States,* 364 U. S. 206, 223 (1960); *Rea* v. *United States,* 350 U. S. 214, 216–217 (1956); cf. *Hampton* v. *United States,* 425 U. S. 484, 495 (1976) (POWELL, J., concurring in judgment). This Court has never held, however, that the supervisory power authorizes suppression of evidence obtained from third parties in violation of Constitution, statute, or rule. The supervisory power merely permits federal courts to supervise "the administration of criminal justice" among the parties before the bar. *McNabb* v. *United States, supra,* at 340.

[8] "The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But

The values assigned to the competing interests do not change because a court has elected to analyze the question under the supervisory power instead of the Fourth Amendment. In either case, the need to deter the underlying conduct and the detrimental impact of excluding the evidence remain precisely the same.

The District Court erred, therefore, when it concluded that

we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." *Alderman* v. *United States*, 394 U. S., at 174–175. See also *Stone* v. *Powell*, 428 U. S. 465, 488–489 (1976); *United States* v. *Calandra*, 414 U. S. 338, 348 (1974).

The dissent, *post*, at 746, urges that the balance of interests under the supervisory power differs from that considered in *Alderman* and like cases, because the supervisory power focuses upon the "need to protect the integrity of the federal courts." Although the District Court in this case relied upon a deterrent rationale, we agree that the supervisory power serves the "twofold" purpose of deterring illegality and protecting judicial integrity. See *post*, at 744. As the dissent recognizes, however, the Fourth Amendment exclusionary rule serves precisely the same purposes. *Ibid.*, citing, *inter alia*, *Dunaway* v. *New York*, 442 U. S. 200, 218 (1979), and *Mapp* v. *Ohio*, 367 U. S. 643, 659–660 (1961). Thus, the Fourth Amendment exclusionary rule, like the supervisory power, is applied in part "to protect the integrity of the *court*, rather than to vindicate the constitutional rights of the defendant. . . ." *Post*, at 747; see generally *Stone* v. *Powell*, *supra*, at 486; *United States* v. *Calandra*, *supra*, at 348.

In this case, where the illegal conduct did not violate the respondent's rights, the interest in preserving judicial integrity and in deterring such conduct is outweighed by the societal interest in presenting probative evidence to the trier to fact. See the first paragraph, *supra;* see also, *e. g.*, *Stone* v. *Powell*, *supra*, at 485–486. None of the cases cited by the dissent, *post*, at 744–745, supports a contrary view, since none of those cases involved criminal defendants who were not themselves the victims of the challenged practices. Thus, our decision today does not limit the traditional scope of the supervisory power in any way; nor does it render that power "superfluous." *Post*, at 748. We merely reject its use as a substitute for established Fourth Amendment doctrine.

"society's interest in deterring [bad faith] conduct by exclusion outweigh[s] society's interest in furnishing the trier of fact with all relevant evidence." 434 F. Supp., at 135. This reasoning, which the Court of Appeals affirmed, amounts to a substitution of individual judgment for the controlling decisions of this Court.[9] Were we to accept this use of the supervisory power, we would confer on the judiciary discretionary power to disregard the considered limitations of the law it is charged with enforcing. We hold that the supervisory power does not extend so far.

The judgment of the Court of Appeals is

*Reversed.*

MR. CHIEF JUSTICE BURGER, concurring.

I join the Court's opinion because Payner—whose guilt is not in doubt—cannot take advantage of the Government's violation of the constitutional rights of Wolstencroft, for he is not a party to this case. The Court's opinion makes clear the reason for that sound rule.

Orderly government under our system of separate powers calls for internal self-restraint and discipline in each Branch; this Court has no general supervisory authority over operations of the Executive Branch, as it has with respect to the federal courts. I agree fully with the Court that the exclusionary rule is inapplicable to a case of this kind, but the Court's holding should not be read as condoning the conduct

---

[9] The same difficulty attends respondent's claim to the protections of the Due Process Clause of the Fifth Amendment. The Court of Appeals expressly declined to consider the Due Process Clause. But even if we assume that the unlawful briefcase search was so outrageous as to offend fundamental " 'canons of decency and fairness,' " *Rochin* v. *California,* 342 U. S. 165, 169 (1952), quoting *Malinski* v. *New York,* 324 U. S. 401, 417 (1945) (opinion of Frankfurter, J.), the fact remains that "[t]he limitations of the Due Process Clause . . . come into play only when the Government activity in question violates some protected right of the *defendant,*" *Hampton* v. *United States, supra,* at 490 (plurality opinion).

of the IRS "private investigators" disclosed by this record, or as approval of their evidence-gathering methods.

Mr. Justice Marshall, with whom Mr. Justice Brennan and Mr. Justice Blackmun join, dissenting.

The Court today holds that a federal court is unable to exercise its supervisory powers to prevent the use of evidence in a criminal prosecution in that court, even though that evidence was obtained through intentional illegal and unconstitutional conduct by agents of the United States, because the defendant does not satisfy the standing requirement of the Fourth Amendment. That holding effectively turns the standing rules created by this Court for assertions of Fourth Amendment violations into a sword to be used by the Government to permit it deliberately to invade one person's Fourth Amendment rights in order to obtain evidence against another person. Unlike the Court, I do not believe that the federal courts are unable to protect the integrity of the judicial system from such gross Government misconduct.

I

The facts as found by the District Court need to be more fully stated in order to establish the level of purposeful misconduct to which agents of the United States have sunk in this case. Operation Trade Winds was initiated by the Internal Revenue Service (IRS) in 1965 to gather information about the financial activities of American citizens in the Bahamas. The investigation was supervised by Special Agent Richard Jaffe in the Jacksonville, Fla., office. It was not until June 1972 that the investigation focused on the Castle Bank and Trust Company of the Bahamas. In late October 1972 Jaffe asked one of his informants, Norman Casper, to obtain the names and addresses of the individuals holding accounts with the Castle Bank. Casper set to work soon thereafter. He was already an acquaintance of Michael Wol-

stencroft, vice president and trust officer of the Castle Bank. Casper knew that Wolstencroft frequently visited the United States carrying a briefcase with documents from the Castle Bank. Casper therefore introduced Wolstencroft to Sybol Kennedy, a private detective who worked for Casper. In early January 1973, Casper learned that Wolstencroft planned a business trip to the United States on January 15, 1973, and that he would have Castle Bank records with him on that trip. Plans for the "briefcase caper," as Casper called it, began in earnest.

As found by the District Court, Casper discussed the details of the plan with Jaffe on several occasions during the week before Wolstencroft's trip.[1] Casper told Jaffe that he could get the needed documents from Wolstencroft, but that Jaffe would have to supply photographic services. On January 11, Casper specifically informed Jaffe that he planned to enter an apartment and take Wolstencroft's briefcase. Jaffe then stated that he would have to clear the operation with his superior, Troy Register, Jr., Chief of the IRS Intelligence Division in Jacksonville. Clearance was obtained, and Jaffe told Casper to proceed with the plan.[2] Casper called Jaffe the following day and asked if the IRS could refer him to a locksmith who could be "trusted." Jaffe gave him such a referral.[3]

---

[1] The Court rather blandly states that "Agent Jaffe approved the basic outline of the plan," *ante,* at 730. Such a characterization is misleading in light of the findings of the District Court. As is noted in the text *infra,* Jaffe knew explicit details of the operation in advance and helped to make the arrangements by recommending a locksmith who could be "trusted," by providing a safe and convenient location for the photographing of the documents, and by providing a photographer from the IRS.

[2] Jaffe testified in the District Court that "[w]hatever I knew, he [Register] knew." See 434 F. Supp. 113, 121, n. 40; Tr. 513.

[3] It was clear why Casper needed a locksmith who could be "trusted." Casper testified as follows in the District Court:

"Q. Isn't it a fact, Mr. Casper, you knew you were committing an illegal

The plans were finalized by the time of Wolstencroft's arrival on January 15. Wolstencroft went directly to Sybol Kennedy's apartment. The couple eventually went to a restaurant for dinner.[4] Using a key provided by Kennedy,[5] Casper entered the apartment and *stole* Wolstencroft's briefcase. Casper then rendezvoused with the IRS-recommended locksmith in a parking lot five blocks from the apartment; the locksmith made a key to fit the lock on the case. Casper took the briefcase and newly made key to the home of an IRS agent. Jaffe had selected that location for the photograph-

---

act, and you wanted somebody who could be trusted to keep his mouth shut about it?

"A. There is that possibility, yes.

"Q. Isn't that the fact?

.            .            .            .            .

"A. Yes." 434 F. Supp., at 119, n. 20; Tr. 452–453.

It is interesting to note that even the locksmith who could be "trusted" refused to enter Kennedy's apartment with Casper. *Id.*, at 451.

The Government contends that when Agent Jaffe made the referral he did not know what use Casper intended to make of such a locksmith. Brief for United States 6, n. 4. The District Court found, however, that Jaffe already knew at the time of the referral that Casper intended to enter Kennedy's apartment and to take and open Wolstencroft's briefcase. There were, then, only two logical alternatives why Casper would want such a locksmith: to make a key to enter the briefcase, or to make a key to enter the apartment. Either way, Jaffe must have known that Casper's conduct was improper, and yet Jaffe made the referral anyway.

[4] It was not established at trial what occurred in Kennedy's apartment prior to the couple's departure for dinner. Since it was peculiarly within the power of the United States to produce Kennedy as a witness and since the Government did not explain her absence from the trial, the District Court inferred that Kennedy's testimony "would be unfavorable to the Government by further delineating the improprieties" of the "briefcase caper." 434 F. Supp., at 119, n. 22.

[5] The District Court, after hearing the testimony of both Casper and Jaffe, disbelieved Jaffe's assertion that Casper had informed him beforehand that Kennedy had given Casper a key with which to enter the apartment. See *id.*, at 119, n. 15, 121, n. 40. See also n. 3, *supra.*

ing because it was only eight blocks from the parking lot where Casper met the locksmith and Jaffe knew there was a need to act with haste.[6] The briefcase was opened in Jaffe's presence. Jaffe, Casper, and an IRS photography expert then photographed over 400 documents.[7] Casper had arranged for Kennedy and Wolstencroft to be watched on their date, and this lookout called Casper at the IRS agent's home when the couple finished their dinner. After all the documents had been copied, Casper relocked the briefcase and returned it to Kennedy's apartment. The entire "caper" lasted approximately one and one-half hours.

The illegalities of agents of the United States did not stop even at that point, however. During the following two weeks, Jaffe told Casper that the IRS needed additional information. Casper therefore sent Kennedy to visit Wolstencroft in the Bahamas. While there, acting pursuant to Casper's instructions, Kennedy stole a rolodex file from Wolstencroft's office. This file was turned over to Jaffe, who testified in the District Court that he had not cared how the rolodex file had been obtained.[8]

The IRS paid Casper $8,000 in cash for the services he rendered in obtaining the information about Castle Bank. Casper in turn paid approximately $1,000 of this money to Kennedy for her role in the "briefcase caper" and the theft of the rolodex file.

The "briefcase caper" revealed papers which showed a close relationship between the Castle Bank and a Florida bank.

---

[6] 434 F. Supp., at 120, n. 25; Tr. 494–496.

[7] As noted previously, Casper had told Jaffe to provide the photographic equipment. Jaffe testified that one of the cameras used was a "microfilmer" which was "much quicker" than a regular camera. This camera had been brought by the IRS because "Casper had to get the documents and the briefcase back to the apartment prior to the return of the owner." Id., at 493–495. This testimony again shows that Jaffe was fully aware in advance that the activities of the evening were improper.

[8] See 434 F. Supp., at 120, and n. 34; Tr. 501.

Subpoenas issued to that Florida bank resulted in the uncovering of the loan guarantee agreement which was the principal piece of evidence against respondent at trial. It is that loan agreement and the evidence discovered as a result of it that the District Court reluctantly [9] suppressed under the Due Process Clause of the Fifth Amendment and under its supervisory powers.

The District Court made several key findings concerning the level of misconduct of agents of the United States in these activities. The District Court found that "the United States, through its agents, Richard Jaffe, and others, knowingly and willfully participated in the unlawful seizure of Michael Wolstencroft's briefcase, and encouraged its informant, Norman Casper, to arrange the theft of a rolodex from the offices of Castle Bank." 434 F. Supp. 113, 120–121 (ND Ohio 1977) (footnotes omitted). The District Court concluded that "the United States was an active participant in the admittedly criminal conduct in which Casper engaged. . . ." *Id.,* at 121. The District Court found that "the illegal conduct of the government officials involved in this case compels the conclusion that they knowingly and purposefully obtained the briefcase materials with *bad faith hostility* toward the strictures imposed on their activities by the Constitution." *Id.,* at 130 (footnote omitted) (emphasis in original). The District Court considered the actions of Jaffe and Casper "outrageous," *ibid.,* because they "plotted, schemed and ultimately acted in contravention of the United States Constitution and laws of Florida, knowing that their conduct was illegal." *Ibid.*

The most disturbing finding by the District Court, however, related to the intentional manipulation of the standing requirements of the Fourth Amendment by agents of the United States, who are, of course, supposed to uphold and

---

[9] See 434 F. Supp., at 124, 129, 134, n. 74.

enforce the Constitution and laws of this country. The District Court found:

> "It is evident that the Government and its agents, including Richard Jaffe, were, and are, well aware that under the standing requirement of the Fourth Amendment, evidence obtained from a party pursuant to an unconstitutional search is admissible against third parties who's [*sic*] own privacy expectations are not subject to the search, even though the cause for the unconstitutional search was to obtain evidence incriminating those third parties. This Court finds that, in its desire to apprehend tax evaders, a desire the Court fully shares, the Government affirmatively counsels its agents that the Fourth Amendment standing limitation permits them to purposefully conduct an unconstitutional search and seizure of one individual in order to obtain evidence against third parties, who are the real targets of the governmental intrusion, and that the IRS agents in this case acted, and will act in the future, according to that counsel. Such governmental conduct compels the conclusion that Jaffe and Casper transacted the 'briefcase caper' with a purposeful, bad faith hostility toward the Fourth Amendment rights of Wolstencroft in order to obtain evidence against persons like Payner." *Id.,* at 131–133 (footnotes omitted).

The Court of Appeals did not disturb any of these findings. 590 F. 2d 206 (CA6 1979) (*per curiam*). Nor does the Court today purport to set them aside. See *ante,* at 730–731, n. 3. But cf. *ante,* at 733–734, n. 5. It is in the context of these findings—intentional illegal actions by Government agents taken in bad-faith hostility toward the constitutional rights of Wolstencroft for the purpose of obtaining evidence against persons such as the respondent through manipulation of the standing requirements of the Fourth Amendment—that the suppression issue must be considered.

744

## II

This Court has on several occasions exercised its supervisory powers over the federal judicial system in order to suppress evidence that the Government obtained through misconduct. See, *e. g., McNabb* v. *United States,* 318 U. S. 332 (1943); *Upshaw* v. *United States,* 335 U. S. 410 (1948); *Mesarosh* v. *United States,* 352 U. S. 1 (1956); *Mallory* v. *United States,* 354 U. S. 449 (1957); *Elkins* v. *United States,* 364 U. S. 206 (1960). Cf. *Rea* v. *United States,* 350 U. S. 214 (1956) (supervisory powers used to enjoin federal agent from testifying in state criminal prosecution concerning illegal search and from turning over to the State evidence illegally seized). The rationale for such suppression of evidence is twofold: to deter illegal conduct by Government officials, and to protect the integrity of the federal courts. *McNabb* v. *United States, supra,* at 342, 345, 347; *Mesarosh* v. *United States, supra,* at 14; *Elkins* v. *United States, supra,* at 217, 222–223. Cf. *Mapp* v. *Ohio,* 367 U. S. 643, 659–660 (1961) (Fourth and Fourteenth Amendments); *Brown* v. *Illinois,* 422 U. S. 590, 599–600 (1975) (Fourth and Fourteenth Amendments); *Dunaway* v. *New York,* 442 U. S. 200, 218 (1979) (Fourth and Fourteenth Amendments). The Court has particularly stressed the need to use supervisory powers to prevent the federal courts from becoming accomplices to such misconduct. See, *e. g., McNabb* v. *United States, supra,* at 345 ("Plainly, a conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in willful disobedience of law"); *Mesarosh* v. *United States, supra,* at 14 (the Court should use its supervisory powers in federal criminal cases "to see that the waters of justice are not polluted"); *Elkins* v. *United States, supra,* at 223 (federal courts should not be "accomplices in the willful disobedience of a Constitution they are sworn to uphold").

The need to use the Court's supervisory powers to suppress evidence obtained through governmental misconduct was perhaps best expressed by Mr. Justice Brandeis in his famous dissenting opinion in *Olmstead* v. *United States,* 277 U. S. 438, 471–485 (1928):

"Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face." *Id.,* at 485.

Mr. Justice Brandeis noted that "a court will not redress a wrong when he who invokes its aid has unclean hands," *id.,* at 483, and that in keeping with that principle the court should not lend its aid in the enforcement of the criminal law when the government itself was guilty of misconduct. "Then aid is denied despite the defendant's wrong. It is denied in order to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination." *Id.,* at 484. See also *id.,* at 469–471 (Holmes, J., dissenting); *id.,* at 488 (Stone, J., dissenting); *Lopez* v. *United States,* 373 U. S. 427, 453, n. 3 (1963) (BRENNAN, J., dissenting).[10]

---

[10] The Court's opinion inexplicably ignores this basic thrust of our prior supervisory powers cases, and instead implies that the only value served

The reason for this emphasis on the need to protect the integrity of the federal courts through the use of supervisory powers can be derived from the factual contexts in which supervisory powers have been exercised. In large part when supervisory powers have been invoked the Court has been faced with intentional illegal conduct. It has not been the case that "[t]he criminal is to go free because the constable has blundered," *People* v. *Defore,* 242 N. Y. 13, 21, 150 N. E. 585, 587 (1926). In these cases there has been no "blunder" by the Government agent at all; rather, the agent has intentionally violated the law for the explicit purpose of obtaining the evidence in question. Cf. *Lopez* v. *United States, supra,* at 440 (supervisory powers should be exercised only if there has been "manifestly improper conduct by federal officials"). If the federal court permits such evidence, the intended product of deliberately illegal Government action, to be used to obtain a conviction, it places its imprimatur upon such lawlessness and thereby taints its own integrity.

The present case falls within that category. The District Court found, and the record establishes, a deliberate decision by Government agents to violate the constitutional rights of Wolstencroft for the explicit purpose of obtaining evidence against persons such as Payner. The actions of the Government agents—stealing the briefcase, opening it, and photographing all the documents inside—were both patently in violation of the Fourth Amendment rights of Wolstencroft [11] and plainly in violation of the criminal law.[12] The Govern-

---

by suppression is deterrence of future misconduct. See *ante,* at 736. Deterrence is one purpose behind the suppression of evidence in such situations, but it is by no means the only one.

[11] The Government conceded below that Wolstencroft's Fourth Amendment rights had been violated. 434 F. Supp., at 126. See Tr. 502. See also Brief for United States in No. 78–5278 (CA6), p. 20. Cf. Tr. of Oral Arg. 14; Brief for United States 39. The Court agrees that the conduct was unconstitutional. *Ante,* at 733.

[12] The Court characterizes the actions of Jaffe and Casper in the brief-

ment knew exactly what information it wanted, and it was that information which was stolen from Wolstencroft. Similarly, the Government knew that it wanted to prosecute persons such as Payner, and it made a conscious decision to forgo any opportunity to prosecute Wolstencroft in order to obtain illegally the evidence against Payner and others.[13]

Since the supervisory powers are exercised to protect the integrity of the *court*, rather than to vindicate the constitutional rights of the defendant, it is hard to see why the Court today bases its analysis entirely on Fourth Amendment standing rules. The point is that the federal judiciary should not be made accomplices to the crimes of Casper, Jaffe, and others. The only way the IRS can benefit from the evidence it chose to obtain illegally is if the evidence is admitted at trial against persons such as Payner; that was the very point of the criminal exercise in the first place. If the IRS is permitted to obtain a conviction in federal court based almost entirely on that illegally obtained evidence and its fruits,

---

case incident as "possibly criminal behavior," *ibid.* The District Court concluded that the actions of the IRS appeared to constitute a prima facie case of criminal larceny under Florida law, and possibly violated other criminal laws of that State as well. 434 F. Supp., at 130, n 66. Casper admitted in the District Court that he knew he was committing an illegal act. Tr. 452–453. The stealing of the rolodex file from Wolstencroft's office was also both unconstitutional and criminal. That theft, however, produced no additional evidence against Payner. See 434 F. Supp., at 123, n. 56.

[13] See *id.*, at 129, n. 65, 131–133, and n. 69. See also Tr. 505.

Wolstencroft in fact was indicted for aiding and abetting Payner. Brief for United States 3, n. 2. However, Wolstencroft is a Bahamian resident, and did not return to the United States to answer the indictment. *Ibid.* The mere fact that the Government went through the steps of indicting Wolstencroft does not in any way undermine the District Court's finding, based on substantial evidence in the record, that Wolstencroft was never the target of the IRS investigation. In light of the Government's concession that Wolstencroft's Fourth Amendment rights were violated, it is hard to see how the banker could be successfully prosecuted on the aiding and abetting charge.

then the judiciary has given full effect to the deliberate wrongdoings of the Government. The federal court does indeed become the accomplice of the Government lawbreaker, an accessory after the fact, for without judicial use of the evidence the "caper" would have been for nought. Such a pollution of the federal courts should not be permitted.[14]

It is particularly disturbing that the Court today chooses to allow the IRS deliberately to manipulate the standing rules of the Fourth Amendment to achieve its ends. As previously noted, the District Court found that "the Government affirmatively counsels its agents that the Fourth Amendment standing limitation permits them to purposefully conduct an unconstitutional search and seizure of one individual in order to obtain evidence against third parties, who are the real targets of the governmental intrusion, and that the IRS agents in this case acted, *and will act in the future,* according to that counsel." 434 F. Supp., at 132–133 (emphasis supplied). Whatever role those standing limitations may play, it is clear that they were never intended to be a sword to be used by the Government in its deliberate choice to sacrifice the constitutional rights of one person in order to prosecute another.

The Court's decision to engraft the standing limitations of the Fourth Amendment onto the exercise of supervisory powers is puzzling not only because it runs contrary to the major purpose behind the exercise of the supervisory powers— to protect the integrity of the court—but also because it appears to render the supervisory powers superfluous. In order to establish that suppression of evidence under the supervisory powers would be proper, the Court would also require

---

[14] It is simply not a sufficient cure for the Court to denounce the actions of the IRS, ante, at 734, while at the same time rewarding the Government for this conduct by permitting the IRS to use the evidence in the very manner which was the purpose of the illegal and unconstitutional activities.

Payner to establish a violation of his Fourth or Fifth Amendment rights,[15] in which case suppression would flow directly from the Constitution. This approach is totally unfaithful to our prior supervisory powers cases, which, contrary to the Court's suggestion, are not constitutional cases in disguise.

I also do not understand the basis for the Court's assertion that this is not a case in which the District Court was supervising the administration of justice "among the parties before the bar," *ante,* at 735, n. 7, and therefore supervisory powers are inapplicable. Clearly the Government is before the bar. Equally clearly, the Government embarked on this deliberate pattern of lawless behavior for the express purpose of gaining evidence against persons such as Payner, so there can be

---

[15] The Court appears to suggest that there can be no suppression of evidence based on a violation of the Due Process Clause in this case because it was not Payner who was the immediate victim of the Government's outrageous conduct. *Ante,* at 737, n. 9. Although the District Court concluded that the evidence should be suppressed under the Due Process Clause as well as under its supervisory powers, the Court of Appeals specifically did not reach that issue, 590 F. 2d 206 (CA6 1979) (*per curiam*), and the Government purposely did not raise the issue in this Court. See Pet. for Cert. 21, n. 13. The Court therefore should not reach out to address the issue in a footnote.

In addition, the only authority cited by the Court for its suggestion is *Hampton* v. *United States,* 425 U. S. 484, 490 (1976) (plurality opinion). *Hampton* was only a plurality opinion, and the issue for which the Court purports to cite it was not raised by the facts of that case. Similarly, in the Court of Appeals below the United States was able to cite only *Sims* v. *Georgia,* 389 U. S. 404, 407 (1967), a case plainly not on point, and the sentence from the *Hampton* plurality opinion quoted by the Court, *ante,* at 737, n. 9, for the proposition that Payner lacked standing to raise a due process argument. See Brief for United States in No. 78–5278 (CA6), pp. 21–22; Reply Brief for United States in No. 78–5278, p. 6. The issue whether the standing limitations this Court has imposed for challenging Fourth Amendment violations also apply for violations of the Due Process Clause based on outrageous Government conduct has not yet been settled by this Court. Cf. 434 F. Supp., at 129, n. 65, and authorities discussed therein. The due process issue should be left for consideration in the first instance by the Court of Appeals on remand.

no legitimate claim that the illegal actions are only tangentially related to the present prosecution. Instead, the Government misconduct is at the very heart of this case; without the evidence produced by the illegal conduct, there would have been no case at all, and Payner would never have been brought before the bar. This is simply not a case in which a federal court has attempted to exercise "general supervisory authority over operations of the Executive Branch," *ante,* at 737 (BURGER, C. J., concurring). Rather, this is a case where the District Court refused to be made an accomplice to illegal conduct by the IRS by permitting the agency to use the proceeds of its crimes for the very purpose for which they were committed—to convict persons such as Payner.

Contrary to the Court's characterization, this is also not a case in which there has been "indiscriminate" or "unbending" application of the exclusionary rule. The District Court noted that "exclusion on the basis of supervisory power is only done as a last resort," 434 F. Supp., at 134, n. 74. That court concluded that suppression was proper only where there had been "purposefully illegal" conduct by the Government to obtain the evidence or where the Government's conduct was "motivated by an intentional bad faith hostility to a constitutional right." *Id.,* at 134–135 (footnotes omitted). In this case, both those threshold requirements were met, and the District Court in addition concluded that absent suppression there was no deterrent to continued lawless conduct undertaken by the IRS to facilitate these types of prosecutions.[16] This is not "a 'chancellor's foot' veto [by the District

---

[16] There is no suggestion by the Government that any action has been taken against Casper, Jaffe, or others for the conduct exposed in this case. The Court admits that the corrective measures taken by the IRS "appear on their face to be less positive than one might expect from an agency charged with upholding the law," *ante,* at 733, n. 5. The District Court specifically found that the Government agents knew they were violating the Constitution at the time, 434 F. Supp., at 135, n. 79, and that continued manipulation of the standing limitations of the Fourth Amendment

Court] over law enforcement practices of which it did not approve," *United States* v. *Russell,* 411 U. S. 423, 435 (1973); *Hampton* v. *United States,* 425 U. S. 484, 490 (1976) (plurality opinion). As my Brother POWELL noted on a prior occasion: "The fact that there is sometimes no sharply defined standard against which to make these judgments '[of fundamental fairness] is not itself a sufficient reason to deny the federal judiciary's power to make them when warranted by the circumstances. . . . Nor do I despair of our ability in an appropriate case to identify appropriate standards for police practices without relying on the 'chancellor's' 'fastidious squeamishness or private sentimentalism.' " *Hampton* v. *United States, supra,* at 495, n. 6 (concurring in judgment). That appropriate case has arrived, and the Court should prevent the Government from profiting by use in the federal courts of evidence deliberately obtained by illegal actions taken in bad-faith hostility to constitutional rights.

I would affirm the judgment of the Court of Appeals and suppress the fruits of the Government's illegal action under the Court's supervisory powers.[17] Accordingly, I dissent.

---

by the IRS could be deterred only by suppression of the evidence, *id.,* at 133.

[17] The Government argues that Rule 402 of the Federal Rules of Evidence stripped the federal judiciary of its supervisory powers to exclude evidence obtained through gross misconduct by agents of the United States. In the Court of Appeals this argument was relegated to one footnote, see Brief for United States in No. 78–5278 (CA6), p. 41, n. 27. The Court does not address the issue. I would merely note that the Government's discussion of the legislative history behind Rule 402 fails to convince me that it was Congress' intent to attempt such a radical curtailment of the long-established supervisory powers of the federal judiciary. See *United States* v. *Jacobs,* 547 F. 2d 772, 777 (CA2 1976), cert. dism'd as improvidently granted, 436 U. S. 31 (1978).