**UNITED STATES of America, Plaintiff,**

v.

**John J. HARRINGTON, et al.,
Defendants.**

**No. CR.S–80–157 RAR.**

United States District Court,
E. D. California.

Oct. 23, 1981.

---

Howard E. Beckler, Beckler & Stevens, Hollywood, Cal., Clyde Blackmon, Blackmon, Wasserman & Blicker, E. Richard Walker, Federal Public Defender, Sacramento, Cal., Rodney Beede, Davis, Cal., Dean L. Peterson, Bonham & Peterson, Folsom, Cal., Alan M. May, May, Margolese & King, North Hollywood, Cal., William K. Gamble, Santa Ana, Cal., Harry E. Hull, Jr., Sacramento, Cal., Howard L. Witzman, Los Angeles, Cal., Michael Pancer, Pancer & Sherman, San Diego, Cal., L. Stephen Turer, Santa Rosa, Cal., David F. Grossman, Pacific Grove, Cal., Michael D. Nasatir, Nasatir, Sherman, Hirsch & Re, P.C., Los Angeles, Cal., James H. Newhouse, Salinas, Cal., for defendants.

Thomas T. Couris, Asst. U.S. Atty., Sacramento, Cal., and Steven L. Basha, U.S. Customs Service, Washington, D. C., for the U.S.

## MEMORANDUM AND ORDER

RAMIREZ, District Judge.

On August 3, 1981, this Court issued its Order granting the defendant's motion to suppress certain items seized from the defendant's home during the execution of a search warrant. The Court found that the individual who applied for and executed the warrant, an officer of the Customs Bureau, was without any authority to do so, and that therefore the search and its fruits were not admissible against the defendant.

On August 14, 1981, the government requested that the Court reconsider its Order of August 3, 1981. The Court granted the motion and ordered the parties to brief the various points raised in the government's motion for reconsideration.

On September 16, 1981, the matter once again came on regularly for hearing. Alan M. May, Esq., appeared on behalf of the defendant, and Assistant United States Attorney Thomas T. Couris and Steven L. Basha, Esq., Office of the Chief Counsel, United States Customs Service, appeared on behalf of the government. The Court having considered the arguments of counsel, as well as the memoranda of points and authorities submitted by the respective parties and the *amicae curia*, now renders the following decision:

### I

The government first asserts that a construction of the Reorganization Plan No. 2 of 1973 and a determination of the Plan's impact on 26 U.S.C. § 7607 are unnecessary to sustain the search challenged by the defendant, because the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 1101, *et seq.*, provides complete authority for the search.

The government bases this argument on 31 U.S.C. § 1105, which provides in relevant part as follows:

> (a) If the Secretary [of the Treasury] has reason to believe that monetary instruments are in the process of transportation and with respect to which a report required under section 1101 of this title has not been filed . . . he may apply to any court of competent jurisdiction for a search warrant. Upon a showing of probable cause, the court may issue a warrant authorizing the search of any or all of the following: . . . .

The government urges the Court to find that since the search warrant was issued, *inter alia*, upon the authority granted by § 1105, the application for and subsequent execution of the warrant was invulnerable to attack.

The defect in the government's argument is that the Court is unable to conclude that the warrant was issued with any consideration of the Currency and Foreign Transactions Reporting Act. While it is true that the affidavit in support of the application for the search warrant makes a fleeting reference to the Act, it is likewise true that the affidavit makes no more than a bald assertion that the affiant has probable cause to believe that the individuals listed in the affidavit have violated 31 U.S.C. § 1101. In addition, the affiant points to no specific, articulable facts from which a neutral and detached magistrate could conclude that the defendant intended to, or was in the process of, violating the Act. Viewed in the light most favorable to the government, and considering the other affidavits that were incorporated by reference, the facts as alleged by the affiant show that while the defendant may have been a distributor of the imported marijuana for the other defendants, he was not a part of the importation enterprise. These facts, therefore, cannot give rise to a finding of probable cause to believe the defendant was committing currency violations.

■ It is hornbook law that an affidavit to issue a search warrant must contain sufficient information for a neutral and detached magistrate to determine that probable cause exists to believe that contraband or evidence of criminal activity will be found in the place to be searched. *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). In the present case, the affidavit proffered in support of the search warrant contained *no* information whatsoever upon which a neutral and detached magistrate could conclude that probable cause existed to believe that the defendant was intending to commit or in the process of committing a violation of 31 U.S.C. § 1101. Accordingly, the authority vested in the Customs officers by 31 U.S.C. § 1105 can have no relevance to the instant search.

■ At oral argument, the government tendered an additional argument based on the authority granted Customs officers pursuant to 31 U.S.C. § 1105. The government contended that, notwithstanding the total want of probable cause to believe that the defendant was in the process of committing a violation of § 1101, Title 31 U.S.C. § 1059 [1] authorizes the invocation of the search authority granted pursuant to § 1105 in the investigation of other crimes. For the reasons as set forth herein, this contention must be rejected.

■ First, § 1059 is merely a penalty-enhancement statute; it does not confer investigatory jurisdiction. Second, interpretation of Title 31's various provisions in the manner urged by the government would make a nullity of all other provisions of federal law which assign Customs officers various duties and limit their power and authority in the performance of those duties. Third, as many courts have observed, Customs officers are not "general guardians of the public peace." *United States v. Diamond*, 471 F.2d 771 (9th Cir. 1973), *United States v. Diezel*, 608 F.2d 204 (5th Cir. 1979). Most federal crimes involve money, its acquisition, transportation, and distribution. Under the interpretation of § 1059 tendered by the government, commission of any crime involving money could

---

1. 31 U.S.C. § 1059 provides as follows:

Whoever willfully violates any provision of this chapter where the violation is—

(1) committed in furtherance of the commission of any other violation of Federal law, or

(2) committed as part of a pattern of illegal activity involving transactions exceeding $100,000 in any twelve-month period,

shall be fined not more than $500,000 or imprisoned not more than five years, or both.

trigger the investigatory authority of the Customs officers, and Customs officers would indeed become "general guardians of the public peace." The concept that the Customs officers have a special mission, along with special powers, see *United States v. Soto-Soto*, 598 F.2d 545 (9th Cir. 1979), would be rendered meaningless.

Accordingly, the Court concludes that the authority vested in the officers of the Customs Service by 31 U.S.C. § 1105 has no application to the search challenged herein.

## II

■ The government next asserts that the Court was in error when it concluded that the Reorganization Plan No. 2 of 1973, 87 Stat. 1091, 1973 U.S. Code, Cong. & Admin. News 3554, stripped the Customs officers of their general drug-enforcement authority. In large measure, the government's argument consists of urging the Court to read the language of the Reorganization Plan on a piecemeal basis, giving greater emphasis to certain words in the Presidential Transmittal Memorandum. The government suggests that from these carefully selected bits of language, one can "glean" an Executive intent to give primary authority to the Drug Enforcement Administration while leaving secondary authority in other federal agencies.

The Court, in its Order of August 3, 1981, acknowledged the existence of this argument. The Court then, as now, found it to be wholly unpersuasive. An interpretation of the Reorganization Plan in the manner urged by the government would not only do violence to the plain language of the Plan itself but also to the policy of said Plan. In this regard, Section 1 of the Reorganization Plan provides:

There are hereby transferred from the Secretary of the Treasury, the Department of the Treasury, and any other officer or any agency of the Department of the Treasury, to the Attorney General *all* intelligence, investigative, and law enforcement functions, vested by law in the Secretary, the Department, officers or agencies which relate to the suppression of illicit traffic in narcotics, dangerous drugs, or marijuana . . . . (emphasis added)

One would be hard-pressed to draft plainer language than that used in Section 1 of the Reorganization Plan. Once *all* intelligence, investigative, and law enforcement functions had been transferred from the Secretary of the Treasury to the Attorney General, Treasury had *no* such functions to perform. For this reason, this Court finds itself unable and unwilling to read the quoted language to mean less than it clearly says.

The reading urged by the government would render meaningless the narrow, explicit exception created by Section 1 of the Reorganization Plan. Section 1 explicitly provides that Customs shall continue to have investigative authority " . . . at the ports of entry or anywhere along the land or water borders of the United States . . . ." If Customs, despite the enactment of the Reorganization Plan,[2] had continuing authority to engage in general drug-enforcement activities, that exception would be irrelevant and mere surplusage. The Court is unable and unwilling to conclude that the President meant absolutely nothing by the language of Section 1.[3]

Further, the plain language of 5 U.S.C. § 907, discussed in greater detail, *infra*, undercuts the government's primary-secondary argument. Section 907 provides that when a reorganization plan reassigns a

**2.** A Reorganization Plan does not become law by the affirmative act of Congress. Pursuant to 5 U.S.C. § 906, a Reorganization Plan becomes law if neither House disapproves it within 60 days of its submission to Congress by the President.

**3.** The government's reliance on *United States v. Diezel*, 608 F.2d 204 (5th Cir. 1979) is mis-

placed. First, the Court did not address the application of the Reorganization Plan to 26 U.S.C. § 7607. Second, the search in that case fell clearly within the explicit exception of Section 1 of the Reorganization Plan since the search was conducted at a water border of the United States.

function vested by statute "the function . . . shall be deemed as vested in the agency under which the function is placed by the plan." It is impossible to read § 907 as leaving responsibility for the discharge of the function in the agency to whom it was originally assigned.

■ The weightier argument proffered by the government is that the Court's interpretation of the Reorganization Plan constitutes an implied repeal of 26 U.S.C. § 7607, and, of course, implied repeals are strongly disfavored. The Court, however, finds that in making this argument the government misconstrues 5 U.S.C. § 907. Title 5 U.S.C. § 907 provides in pertinent part as follows:

(a) A statute enacted . . . or a function affected by a reorganization under this chapter . . . has . . . the same effect as if the reorganization had not been made. However, if the statute . . . has vested the functions in the agency from which it was removed under the reorganization, the function . . . shall be deemed as vested in the agency under which the function is placed by the plan.

Thus the President's decision to remove a function from one agency and confide the responsibility for the discharge of that function in another agency is not a repeal, implied or otherwise, of the statute vesting the function in the first agency.

The effect of § 907 is to transfer all of the drug-enforcement functions and authority from the Customs Service to the Drug Enforcement Administration, in conformance with the Reorganization Plan. Specifically, Section 1 of the Reorganization Plan transferred ". . . all intelligence, investigative, and law enforcement *functions* . . . which relate to the suppression of illicit traffic in narcotics . . . ." from the Department of the Treasury to the Department of Justice. (emphasis supplied) Title 5 U.S.C. § 907 provides that when a *function* is transferred from one agency to another, the statute remains in full force and effect, but the substituted agency exercises the authority granted by the statute. Thus a construction of the Reorganization Plan No. 2 of 1973 as a transfer of functions from the

Department of the Treasury to the Department of Justice does not constitute an implied repeal of 26 U.S.C. § 7607.

For all the reasons discussed herein, the Court does not construe the Reorganization Plan No. 2 of 1973 as leaving secondary authority in the officers of the Customs Service.

### III

■ Having disposed of two of the government's preliminary contentions, the Court is now required to reach the more difficult issue raised by the government's motion to reconsider: does the total want of statutory authority for the application and execution of the search warrant necessitate the invocation of the exclusionary rule?

The government has cited the Court to a long line of cases which hold that technical violations of Rule 41 of the Federal Rules of Criminal Procedure do not warrant the invocation of the exclusionary rule. While the Court concedes the validity and wisdom of the holdings of those cases, the Court finds them unhelpful to the question posed by the case at bar. Indeed, insofar as the Court can determine from the record, the application for and execution of the warrant was technically perfect. The issue here, however, is whether the application for and execution of the search warrant by a law enforcement officer without the authority to do so is a "mere" technical violation?

The Court is aware of the case of *United States v. Pennington*, 635 F.2d 1387 (10th Cir. 1980), which bears on this question. In *Pennington*, the United States Magistrate issued a warrant to an Oklahoma state officer authorized under Oklahoma law to conduct searches and enforce the drug laws of the State of Oklahoma. The search was conducted exclusively by Oklahoma state officers, and thus that provision of Federal Rule of Criminal Procedure 41(c) which requires that "The warrant shall be directed to a civil officer of the United States authorized to enforce or assist in enforcing any

law thereof or to a person so authorized by the President of the United States" was violated. The defendant was prosecuted in federal court for a violation of 21 U.S.C. §§ 841(a)(1) and 846.

The Tenth Circuit, over one dissent, held that the deviation from the requirements of Rule 41(c) did not warrant the application of the exclusionary rule. In holding that the exclusionary rule should be applied circumspectly to situations where there is no constitutional violation, the court found that since it had not been shown that the search would not have occurred but for the violation of the rule or would have occurred in a less abrasive manner, and since it had not been shown that the disregard of the rule was deliberate or intentional, the exclusionary rule would not be invoked.

Although *Pennington* is instructive on the issue, it is not on all fours with the instant case. The court in *Pennington* carefully noted that the Oklahoma officer who applied for and executed the warrant was authorized under Oklahoma law to apply for and execute warrants and to enforce the drug laws. Therefore, the *Pennington* case does not involve the situation where the law enforcement officer has no authorization under any law to conduct the search and in fact has specifically had said authorization taken away by direct action of the President of the United States.

Furthermore, the decision of the Ninth Circuit in *United States v. Soto-Soto*, 598 F.2d 545 (9th Cir. 1979) would seem to be contrary to the *Pennington* decision. *Soto-Soto* did not involve the application for and execution of a search warrant, but it did involve a federal law enforcement officer acting beyond the scope of his statutory authority. In *Soto-Soto*, an agent of the Federal Bureau of Investigation was conducting an investigation into the international theft of stolen vehicles at the United States-Mexican border. In the course of that investigation, but without a "founded suspicion" to believe that the driver had violated any law, the FBI agent stopped the driver of a 1976 Chevrolet pickup truck and without the consent of the driver opened the hood of the truck and discovered marijuana.

The district court granted the defendant's motion to suppress, holding that since there was no "founded suspicion" for the stop, it could not be justified as conventional law enforcement activity. The district court further held that since the search was not done with the participation of or coordination with the Customs Service, it could not be justified as a border search.

The Ninth Circuit affirmed the decision of the district court explaining that the rights of the individual, *vis-a-vis* the sovereign, are significantly reduced at the border. In holding that the sovereign has delegated its broad powers to search those who would enter the United States to the Customs Service, the Ninth Circuit found that the FBI agent who conducted the search did not have statutory authority to do so and, further, that the search conducted was not a search to enforce the importation laws. The Ninth Circuit concluded that the search was invalid.

The government emphasizes that in *Soto-Soto* the FBI agent who conducted the search did not have probable cause to stop the truck and, as such, the absence of probable cause was the sole and determining factor in regard to the search at issue. The government contrasts that situation with the instant situation, where, as the Court has already determined, there was probable cause to believe that fruits and evidence of participation in a drug-distribution enterprise would be found in the place to be searched.

The government is absolutely correct that the lack of probable cause was the sole and determining issue insofar as it concerned an FBI investigation into the international theft of motor vehicles, 18 U.S.C. §§ 2311–2313, 28 U.S.C. § 531, *et seq.* Once having determined, however, that the search could not withstand that scrutiny, the Ninth Circuit was compelled to determine whether the search could be justified as a "border search." Justification as a "border search" was impossible because (1) it was not undertaken to enforce the immigration laws, *and*

(2) was conducted by an FBI agent rather than a Customs officer.

In *Soto-Soto* the Ninth Circuit decided that one federal law enforcement officer may not use the statutory authority given by Congress to another federal law enforcement agency, and that the evidence acquired by a search conducted without any statutory authority must be excluded from the trial. The Ninth Circuit held:

> Here, the FBI agent's action violated federal statutes. He ignored the divisions of authority which Congress carefully legislated. As in *Miller* [*v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958)], the exclusionary rule is applicable.

In reading *Soto-Soto*, it is apparent that the Ninth Circuit felt that a very important policy would be served by the application of the exclusionary rule to a search conducted by an officer without the statutory authority to do so: it would deter individual officers from ignoring the delegations of authority painstakingly created by Congress.

The value that the Ninth Circuit identified in *Soto-Soto* is well illustrated by the instant case. The legislative history of the Reorganization Plan makes it clear that Congress thought long and hard about the wisdom of taking Customs out of the drug-enforcement business, *see* 119 Cong.Rec. 18465, *et seq.* It appears, however, that all of the deliberations of Congress were for naught, because the attorneys for the government have indicated that the Customs Service has instructed its officers that the Reorganization Plan No. 2 of 1973 has had no effect on the authority and powers of the Customs Service. Statutory law is currently being, and has been for the past eight years, disregarded. "Exclusion of the evidence seized is the only effective deterrent of such disregard." *United States v. Soto-Soto, id.* at 550.

Thus this Court concludes that under *United States v. Soto-Soto* the evidence procured as a result of the search must be excluded.

The government also argues that whatever relevance *Soto-Soto* may have been when it was decided, it has been overruled, albeit *sub silentio,* by *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). In *United States v. Payner* federal law enforcement officers engaged in flagrantly criminal conduct that admittedly deprived someone other than the defendant of his fundamental constitutional rights. The United States Supreme Court reiterated its earlier standing rule, holding that since the flagrantly criminal conduct did not violate the defendant's own constitutional rights, the defendant had no standing to complain of the conduct. The Supreme Court went on to hold that the inherent supervisorial power of the Court ought not to be invoked to exclude evidence in any situation where the Fourth Amendment would not give rise to exclusion:

> We conclude that the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully *from a third party not before the court.* Our Fourth Amendment decisions have established beyond any doubt that the interest in deterring illegal searches does not justify the exclusion of tainted evidence *at the instance of a party who was not the victim of the challenged practices.* (emphasis supplied)

*United States v. Payner,* 100 S.Ct. at 2446. The government argues that *United States v. Payner* stands for the proposition that a violation of the law that does not rise to a violation of a constitutional right may not justify the invocation of the exclusionary rule. This Court cannot read *United States v. Payner,* a standing case, so broadly.

In *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), relied upon by the Ninth Circuit in *United States v. Soto-Soto,* the United States Supreme Court held that violation of federal law does warrant the invocation of the exclusionary rule. The decision in *United States v. Payner* did not purport to overrule the decision in *Miller v. United States,* and, in fact, the continuing validity of *Miller v. United States* was noted in *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59

L.Ed.2d 733 (1979). Thus this Court concludes that *United States v. Payner* had not, *sub silentio* or otherwise, overruled *United States v. Soto-Soto.*

Additionally, of course, this Court feels constrained to decline the invitation to disregard Ninth Circuit precedent apparently on point. Without an explicit statement to the contrary from either the Ninth Circuit or the United States Supreme Court, this Court feels bound by *United States v. Soto-Soto.*

For all of the reasons discussed herein, the motion of defendant HARRINGTON to suppress all goods seized from his home is

**4.** See *United States v. Harrington*, 520 F.Supp. 93 (E.D.Cal.1981).

again Granted.[4] All items seized from the defendant not plainly contraband shall be returned to the defendant within seven (7) days of the date of this Order unless the government files a notice of appeal within that period, in which case the Order of Delivery is stayed pending appeal.

IT IS SO ORDERED.