**UNITED STATES of America,**

v.

**Roger Kyle CHAPMAN and James Joseph Faria, Defendants.**

**No. Crim.4:01–CR431(CDL).**

United States District Court,
M.D. Georgia,
Columbus Division.

March 5, 2002.

---

John Larkin Lynch, Columbus, GA.

J. Mark Shelnutt, Columbus, GA.

Frank K. MArtin, Columbus, GA.

### ORDER

LAND, District Judge.

Defendant, JAMES JOSEPH FARIA, filed a motion to suppress certain statements made by him and other evidence seized by the government. The Court held a hearing on Defendant's motion on February 22, 2002. Based on the evidence presented at that hearing, the argument of counsel, and the applicable law, the Court denies Defendant's motion to suppress for the reasons set forth below.[1]

### BACKGROUND

On September 26, 2001, at approximately 10:30 P.M., agents with the Columbus Metro Narcotics Task Force ("Metro"), conducted a "trash pull" at 6455 Malibu Drive, Columbus, Georgia, the residence of Roger Kyle Chapman. A "trash pull" is an undercover investigative technique in which the police search a person's trash which has been placed at or near the street, which is outside the curtilage of the home. The agents observed a trash can on the street next to the curb outside of Chapman's residence. The agents took the trash can to another location and searched the contents. Agents found a 200 milligram bottle of Demo–Testosterone (a steroid), with some residue inside the bottle. They also found a marijuana stem and some residue. A field test was conducted which indicated that the stem was marijuana. The agents then returned the trash can to its original location on the street outside Chapman's house.

Based on the contents of the trash, the agents requested a search warrant for Chapman's residence. On September 27, 2001, agent John Memmo ("Memmo") presented a search warrant and affidavit to Judge Mary Buckner, Recorder's Court Judge in Columbus, Georgia. The search warrant affidavit contained the following facts: (1) the affiant, Agent John Memmo, is a member of the Metro Narcotics Task Force; (2) within the past 72 hours Metro agents conducted a controlled trash pull at 6455 Malibu Drive, which is the residence of Roger Kyle Chapman; (3) during the trash pull, agents found a quantity of marijuana and steroids, which is in violation of Georgia law, O.C.G.A. § 16–13–30; (4) independent investigation reveals that Roger Kyle Chapman resides at 6455 Malibu Drive; (5) Chapman is a known narcotics user, having been arrested on August 18, 1995, for a violation of the Georgia Control Substance Act for possession of schedule IV steroids and marijuana.

Agent Memmo provided oral testimony to the judge when he presented the search warrant. In response to questions from the judge, Agent Memmo explained what the term "trash pull" meant and told the judge that the trash can had been located on the street next to the curb, on the City right of way. The judge signed the warrant on September 27, 2001, after finding that there was probable cause to believe that Roger Kyle Chapman was in possession and control of a quantity of marijuana and steroids at 6455 Malibu Drive.

---

1. Defendant Faria was indicted along with Roger Kyle Chapman in a three count indictment. Counts 1 and 3 of the indictment apply to Faria. In Count 1, Faria and Chapman are accused of aiding and abetting each other in the unlawful possession with the intention of distributing a schedule I controlled substance ("Ecstasy"). In Count 3, Faria is accused of possessing a firearm in furtherance of a drug trafficking crime. Chapman has pled guilty to Count 1 of the indictment.

At approximately 7:20 P.M. on September 28, 2001, agents set up a surveillance at 6455 Malibu Drive. The agents observed a 1994 Ford Probe automobile with a Florida tag parked on the street near the driveway of Chapman's residence. Agent Memmo testified at the suppression hearing that they had engaged in surveillance of Chapman's house on previous occasions, and the Ford Probe vehicle with a Florida tag was unfamiliar to them. Agents maintained surveillance on the house and vehicle for approximately 45 minutes. During this time, no one arrived at or left the residence. The agents then observed a white male, later identified as Defendant James Faria, exit the back door of the residence and walk toward the Ford Probe. At this point, the agents exited their vehicles to execute the search warrant. Faria was stopped on Chapman's driveway and observed with a rolled up tee shirt in his hand. The tee shirt had a "bulge" within it. Agent Memmo testified that based upon his experience and his observation of the bulge in the tee shirt, it appeared to him that Faria had a weapon wrapped up in the tee shirt. The agents therefore looked inside the shirt for their own protection. Instead of a weapon, they found $8,000 in cash rolled up in the shirt. The $8,000 was in four bundles of $2,000 each.

The agents temporarily detained Faria while they entered Chapman's house. Chapman was encountered when they entered the house, and he was detained. During the search of Chapman's house, pursuant to the search warrant, agents found a plastic bag containing 1,000 tablets of methylenedioxymethamphetamine (MDMA), commonly referred to as "Ecstasy," in plain view on top of the dresser in the master bedroom. They also found a loaded Witness 9mm handgun in a nighttable drawer in the master bedroom, and $500 in cash was found in a jewelry box in the master bedroom. After the Ecstasy pills were found, Chapman and Faria were placed under arrest. They were provided with their "Miranda rights," and their persons were searched. The agents found $1,041 on Chapman and $1,012 on Faria.

The agents searched Chapman's den and found $19,000 in cash inside a desk drawer. Money wrappers were also found in the den which matched the wrappers found on some of the money taken from Faria and Chapman. A box of syringes was found on a shelf in the den.

The agents searched the kitchen and found the following items: a box inside the refrigerator which contained one vial with a small amount of the steroid Somatropin (Serostim), which is a human growth hormone, and 15 empty steroid vials; a plastic bag containing approximately 16 grams of marijuana in a cabinet above the stove; and a plastic bag with a marijuana "roach" on top of the refrigerator.

Agents seized a cell phone and pager from Faria. The pager contained Chapman's business telephone number. The cell phone had Chapman's home, work, and cell phone numbers stored in it.

After the search of the house was complete, the agents searched Faria's Ford Probe. They conducted the search of Faria's vehicle incident to their arrest of Faria. They also had reason to believe that Faria had used the vehicle to supply Chapman with illegal drugs. Their belief was based upon the cash found on Faria, the contraband found in Chapman's house, voluntary statements made by Chapman, conflicting statements by Faria as to where he got the $8,000 that was wrapped up in the tee shirt, and the Florida tag on the unfamiliar Ford Probe vehicle. During their search of Faria's car, the agents found a loaded 40 caliber Glock handgun in the glove box.

After the Defendants were arrested and advised of their constitutional rights, they each made a number of statements at the residence. Faria said that he did not know how much money was in the tee shirt and could not tell the agents where the money came from. He later said that he got the money from the sale of a car to a person he could not identify.

Chapman told the agents that they found all the "goodies" after the Ecstacy tablets were found. He asked an agent "Who set me up?—it takes two to tango." He said that he quit dealing drugs for a while but got back into it because he needed the money. Chapman said that he thought the bag contained 900 pills of Ecstacy. He said he did not know how much money was in the bag which had been found in the desk in the den.

Chapman and Faria were then transported to the Metro office where they were processed. They were again advised of their constitutional rights, and both stated they did not want to make any other statements. Both Defendants were placed in an interview room together. Agents listened to and recorded their conversation without the Defendants' knowledge. Included in their conversation was a discussion about who might have set them up.

Defendant Faria filed a motion to suppress any evidence obtained from Chapman's house, the $8,000 cash found wrapped up in the tee shirt, the $1,012 cash found on his person, and the gun found in his car. He also moved to suppress any statements made by him.

### THE SEARCH OF CHAPMAN'S RESIDENCE

█ "The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir.1984). A substantial basis for probable cause exists where the totality of the circumstances set forth in the affidavit provides sufficient information for a magistrate to determine that there is a fair probability that contraband or evidence of a crime will be found in a particular place. *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir.1991), citing *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Under this analysis, "the issuing magistrate must only make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying the hearsay information, there is probable cause to issue the search warrant. Reviewing courts must only ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Betancourt*, 734 F.2d at 755. "A magistrate's decision that probable cause exists is conclusive absent arbitrariness." *Id.* at 754. "Great deference is accorded to the magistrate's determination of probable cause." *Gonzalez*, 940 F.2d at 1419. The Supreme Court has held that affidavits supporting search warrants are presumptively valid. *United States v. Jenkins*, 901 F.2d 1075, 1080, (11th Cir.1990), citing *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

█ In this case, the probable cause set forth in the search warrant affidavit is based primarily on the evidence of drug activity contained in Chapman's trash, which was observed by the agent. The agent stated in the affidavit that he had seized a quantity of marijuana and steroids from the trash at 6455 Malibu Drive within the previous 72 hours. He also said that his independent investigation revealed that

Chapman resided at that address. The agent also stated that Chapman was a known narcotics user who had been arrested on August 18, 1995, for possession of steroids and marijuana. Furthermore, the agent provided oral testimony to the judge when he presented the search warrant. He explained to the judge what a trash pull was and that the agents had taken the trash can from the street next to the curb which is on the City right of way.[2]

The Court finds that under the "totality of the circumstances" standard established by the Supreme Court, there was a substantial basis for the judge's conclusion that probable cause existed to believe that steroids and marijuana were located inside Chapman's house. The judge, who must make a practical, common-sense decision, given all the circumstances before her, reasonably concluded that the items found in a trash can outside Chapman's residence were recently located inside the residence. She was provided additional support for this conclusion by the statement in the affidavit that Chapman had previously been arrested for possession of steroids and marijuana, the very same drugs found in the trash.

▮▮▮▮ Accordingly, the Court finds that sufficient and substantial evidence exists that the search warrant was properly based upon probable cause. The Court further finds that the search of Chapman's

residence was reasonable and consistent with the search warrant. Therefore, insofar as Faria's motion to suppress seeks to suppress the introduction of evidence obtained from inside Chapman's house during the search pursuant to the search warrant, Defendant Faria's motion is denied.[3]

## THE STOP, FRISK, AND DETENTION OF FARIA

▮▮▮▮ Defendant Faria also argues that he was unlawfully detained, stopped, and frisked in violation of his Fourth Amendment rights. "A warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). Moreover, a police officer who encounters a person during the execution of a search warrant is entitled to frisk that person if the officer has a reasonable suspicion that the person is armed or otherwise dangerous. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *United States v. Bonds*, 829 F.2d 1072, 1074–75 (11th Cir.1987).

▮▮▮▮ In the present case, Agent Memmo testified that when he approached Fa-

---

**2.** There is no Fourth Amendment protection for garbage or trash when it is set out for collection. *California v. Greenwood*, 486 U.S. 35, 37, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988).

**3.** The Court further notes that even if there was some defect in the search warrant, Defendant Faria lacks standing to challenge the warrant issued for Chapman's residence. In order to challenge a search, the defendant must allege that he had a legitimate expectation of privacy in the area searched and the items seized. *Rawlings v. Kentucky*, 448 U.S. 98, 104–06, 100 S.Ct. 2556, 65 L.Ed.2d 633

(1980). The mere assertion that the Defendant was legitimately on the premises is insufficient to establish standing to contest a search of Chapman's residence. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). A person in a home for a short period of time to conduct a business transaction has no Fourth Amendment protection relating to the home. *Minnesota v. Carter*, 525 U.S. 83, 90, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). *See also, United States v. Payner*, 447 U.S. 727, 731, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980).

ria on Chapman's driveway after Faria exited Chapman's house, he thought the tee shirt that had a bulge within it likely contained a weapon. His assessment was based on both his personal observation and his experience. "Numerous cases have recognized that guns are a tool of the drug trade. There is a frequent and overpowering connection between the use of firearms and narcotics traffic." *United States v. Cruz*, 805 F.2d 1464, 1474 (11th Cir.1986). "Guns and violence go hand in hand with illegal drug operations." *United States v. Hromada*, 49 F.3d 685, 689 (11th Cir.1995). In addition to Faria's presence at Chapman's residence, the agents observed the Florida license plate on the vehicle they suspected belonged to Faria. They were aware that Florida was a primary source of illegal drugs in the Columbus area based upon their experience. Therefore, the Court finds that the agents clearly were justified in detaining Faria and searching the tee shirt, which they had a reasonable suspicion to believe contained a weapon. *See Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (wherein the Supreme Court found a "bulge" in jacket of defendant automobile operator, who had been lawfully ordered out of automobile following stop for traffic violation, permitted officer to conclude that defendant was armed and thus posed a serious and present danger to safety of officer thus justifying pat down search of defendant whereby weapon was discovered).

Defendant cannot seriously dispute that the stop and frisk of Faria was an authorized and valid *Terry* stop. Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the police are authorized to stop and briefly detain a person for investigative purposes if they have a reasonable suspicion supported by articulable facts that an individual may be involved in criminal activity, even if they

lack probable cause under the Fourth Amendment. *See also United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Under the totality of the circumstances, the Court finds that the stop and frisk of Faria was justified and that it did not violate any of Defendant Faria's constitutional rights. Therefore, the $8,000 seized during the stop and frisk of Faria was legally obtained, and Defendant's motion to suppress the introduction of it is denied.

### THE SEARCH OF FARIA'S PERSON INCIDENT TO LAWFUL ARREST

After arresting Faria, the agents searched his person incident to the arrest. They discovered $1,012 in cash, a pager, and a cell phone with Chapman's various telephone numbers programmed in it. This search of Faria's person was clearly authorized incident to his arrest. *See Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685. Therefore, Defendant's motion to suppress the introduction of this evidence is denied.

### THE SEARCH OF FARIA'S CAR

The search of Faria's car is the most worrisome aspect of the search in this case. Notwithstanding the Court's concerns about the search of the car, the Court finds that sufficient probable cause existed for the search and therefore denies Faria's motion to suppress the gun that was found in the car. Although the search of Faria's car occurred after he was arrested, the Court rejects the government's argument that the search of Faria's car was justified based upon the theory that it was conducted incident to a lawful arrest. Generally, when making a lawful arrest, police may conduct a warrantless search of the area within the arrestee's control which is "the area from within which he

might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The search of the interior of a vehicle is often reasonable because it is an area from which the Defendant could have obtained a weapon or destroyed evidence. *Michigan v. Long*, 463 U.S. 1032, 1045–52, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1982). However, in this case, the evidence is that prior to the search of the car, Defendant Faria had been handcuffed and was inside the Chapman house, nowhere near the vehicle. Therefore, the car did not need to be searched without a warrant to prevent Faria from gaining possession of a weapon. Furthermore, it defies common sense to suggest that the car needed to be searched without a warrant in order to prevent Faria from destroying evidence. He was in custody secured by handcuffs and nowhere near the car. Therefore, the government cannot justify the warrantless search of the car based upon it allegedly having been conducted incident to a lawful arrest.

 The Court finds, however, that the agents had probable cause to search the car without a warrant. They had discovered approximately 1,000 tablets of Ecstacy inside the Chapman house, along with other alleged contraband. They had discovered $8,000 in cash on Faria's person and had evidence indicating that some of the cash wrappers on Faria's cash matched those in the Chapman home. Based on their experience, the Florida tag gave them reason to believe that the vehicle was involved in illegal drug activity. Faria's inconsistent statement as to the source of the $8,000 in cash also caused the agents to believe that the vehicle contained additional evidence of illegal drug activity.

Under the totality of the circumstances, the Court finds that there was probable cause for the agents to believe that Faria had delivered the 1,000 Ecstasy tablets in his vehicle, and that there was additional evidence of the crime in the vehicle. When there is probable cause to believe that there is evidence of a crime in a vehicle, it may be searched without a warrant. *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

Accordingly, the Court finds that the gun obtained during the search of Faria's car was properly found and seized, and the search did not violate the Fourth Amendment. Therefore, Faria's motion to suppress the gun is also denied.

### STATEMENTS BY FARIA

The Court also denies Defendant's motion regarding the suppression of statements made by Faria. Faria's statements were clearly voluntary. Moreover, Faria was properly given the appropriate Miranda warnings.[4]

### CONCLUSION

Based on the foregoing, the Court hereby denies Defendant Faria's motions to suppress.

---

**4.** At the suppression hearing on this matter, it appeared that after discovering additional evidence surrounding the timing of the statements, Defendant Faria's counsel even conceded that there is no legitimate basis for the suppression of the statements.