T.C. Memo. 2002-68

UNITED STATES TAX COURT

YU-YANG WU, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19108-99.                    Filed March 22, 2002.

Yu-Yang Wu, pro se.

<u>Dale A. Zusi</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, <u>Judge</u>:  Respondent determined the following
deficiencies and fraud addition to tax and penalties with respect
to petitioner's Federal income taxes:

| Year | Deficiency | Addition to Tax Sec. 6653(b) | Penalty Sec. 6663 |
|------|-----------|------------------------------|-------------------|
| 1988 | $35,523 | $26,642 | --- |
| 1989 | 17,502 | --- | $13,127 |
| 1990 | 29,203 | --- | 21,902 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The deficiencies were based on respondent's determinations that petitioner failed to report income of $93,374 in 1988, $52,543 in 1989, and $78,253 in 1990. At trial, respondent conceded that petitioner's unreported income should be reduced by $10,997 in 1990 to reflect items that respondent inadvertently double counted. We sustain respondent's deficiency determinations, as adjusted, and the fraud addition to tax and penalties applicable thereto.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the related exhibits are incorporated by this reference.

Petitioner, who is also known as David Wu, resided in Palo Alto, California, when he filed his petition.

During the years at issue, petitioner owned at least 30 percent of Palo Alto Computer, doing business as Palo Alto Microsystems (PAC), a subchapter C corporation. The record does

not disclose who, if anyone, owned the remaining interests in PAC. PAC was in the business of selling and repairing personal computers and computer parts.

Petitioner was in charge of PAC. He made the day-to-day business decisions for PAC, signed its corporate income tax returns, had sole signature authority for PAC's business checking account, hired and supervised PAC's bookkeepers and return preparers, and dealt with customers daily by making sales and receiving payments.

Petitioner understood that all revenue receipts from the sale of computer equipment and from repairs performed by PAC should be deposited in PAC's business account. Petitioner also understood that PAC's accountant was preparing PAC's income tax returns on the basis of information regarding sales, purchases, and expenses that petitioner provided to him from PAC's books and records. PAC's books and records were maintained under petitioner's supervision and control. Petitioner understood that if he failed to record sales revenues in PAC's books and records, those revenues would not be reported on PAC's income tax returns.

Petitioner instructed many of PAC's customers to pay for their purchases or repairs in cash, to leave the payee lines of their checks blank, or to write petitioner's name on the payee lines of their checks. Petitioner also wrote, or asked PAC's customers to write, on the memo lines of their checks to

petitioner that the payments were on account of loans even though he knew that the payments were on account of computer sales or services.

Petitioner deposited or caused to be deposited in his personal bank account substantial amounts of money representing revenues belonging to PAC's business. Petitioner deposited or caused to be deposited into his personal bank account at least $58,798.44 in 1988, $36,091.69 in 1989, and $50,837.89 in 1990 of income belonging to PAC that was not reported on either PAC's or petitioner's income tax returns.[1]

---

[1]As discussed infra pp. 16-21, respondent's determinations were based on an extremely conservative analysis. During the 3 years before the Court, petitioner deposited $769,612 in his bank account from sources who failed to respond to respondent's requests for information. Respondent treated the deposits from these unexplained sources as not taxable to petitioner. We believe that many of these deposits were taxable income that petitioner diverted from PAC and failed to report. Petitioner had an additional $695,910 in unidentified deposits. Respondent also treated these unidentified deposits as nontaxable to petitioner. Again, we believe that some portion of these unidentified deposits represented taxable income to petitioner. Finally, approximately $80,000 of deposits in petitioner's bank account represented amounts that were reported by either petitioner or PAC. Respondent took the position that any amounts deposited into petitioner's bank account that were reported as income by PAC were not taxable to petitioner. Because PAC was a C corporation, amounts paid by PAC to petitioner would likely constitute income to petitioner in the form of constructive dividends. Nevertheless, respondent treated these amounts as nontaxable to petitioner. Respondent identified as taxable to petitioner only amounts that respondent could verify were revenues of PAC that had not been reported on either PAC's or petitioner's Federal income tax returns.

Petitioner hired different accountants to prepare PAC's and his personal income tax returns and provided them with only limited financial information in aid of his efforts to avoid detection of his unreported income.

On his Forms 1040, U.S. Individual Income Tax Return, for 1988, 1989, and 1990, petitioner reported wage income from PAC of only $9,000, $9,000, and $10,000, respectively. For 1988, 1989, and 1990, petitioner reported gross income of $62,655, $30,254, and $62,457, respectively, and paid taxes of $7,750, zero, and $14,720, respectively.

Despite showing only relatively modest amounts of income on his tax returns, petitioner purchased during the years in issue and the following year (1988, 1989 and 1991) four parcels of improved real property for $1,925,000 and made total downpayments of $755,037.57.[2]

In support of his applications for loans to finance these purchases, petitioner made numerous representations concerning his income that were inconsistent with the positions he took on

---

[2]In 1988, petitioner purchased property located at 3340 Ross Road, Palo Alto, California 94303 for $395,000, paying $152,226.35 down (of which $11,850 was paid from a PAC business account) and property located at 3616 South Court, Palo Alto, California 94306 for $310,000, with a downpayment of $74,832.83. In 1989, petitioner purchased property located at 65 Park Avenue, Atherton, California 94025 for $560,000, with a downpayment of $147,255.15. In 1991, petitioner purchased property located at 3636 El Camino Real, Palo Alto, California, for $660,000, with a downpayment of $380,723.84.

his income tax returns.  Petitioner claimed in a 1988 loan application to receive $8,000 per month in wages from PAC, while reporting only $9,000 for the entire year on his 1988 Federal income tax return.  In a 1989 loan application, petitioner claimed to receive $6,000 per month salary and $4,000 per month in rental income, while reporting on his tax return only $9,000 in wages and $20,560 in rental income for the entire year.

Petitioner understood his legal obligation to report all his income on his Federal income tax returns.  Petitioner was advised repeatedly by his and PAC's accountants of the need to report all his income.  Petitioner knowingly and intentionally structured transactions to avoid detection of his schemes to underreport income.

On June 6, 1995, petitioner was indicted on eight counts of Federal income tax evasion and filing false Federal income tax returns for the years 1988 through 1991.  As part of a plea bargain, petitioner pled guilty to one count of tax evasion for 1988 in return for the dismissal of the remaining counts.  In the final judgment, petitioner was sentenced to 2 years of probation, was fined $8,050, and was required to participate in home detention with electronic monitoring for 6 months.

On December 12, 2000, respondent served on petitioner requests for admission, a first request for production of documents, and a first set of interrogatories.  Petitioner did

not respond to respondent's admissions and discovery requests. By order dated January 30, 2001, this Court granted respondent's motion to compel responses, ordering petitioner to respond to respondent's interrogatories and document requests by February 12, 2001. In our order, we advised petitioner that "in the event petitioner does not fully comply with the provisions of this order, this Court will be inclined to impose sanctions pursuant to Tax Court Rule 104." By order dated February 21, 2001, we held that the matters set forth in respondent's request for admissions were deemed admitted pursuant to Rule 90(e) by reason of petitioner's failure to respond thereto.

At trial, the Court granted respondent's motion for discovery sanctions, which was grounded upon petitioner's inadequate responses to respondent's discovery requests: the Court ruled that any documents covered by respondent's requests that petitioner failed to provide to respondent before trial would not be admitted into evidence at trial. The Court also refused petitioner's request at trial that we hold the record open to allow him to supplement the factual record after trial with additional evidence allegedly held by his former attorney.

OPINION

Issue 1. Petitioner's Liability for Deficiencies

In Judy v. Commissioner, T.C. Memo. 1997-232, we stated:

> Every taxpayer is required to maintain sufficient
> records to enable the Commissioner to establish the

amount of his taxable income. Sec. 6001; sec. 1.6001-1(a) and (b), Income Tax Regs. If such records are lacking, the Commissioner may reconstruct the taxpayer's income by any indirect method that is reasonable under the circumstances. Cebollero v. Commissioner, 967 F.2d 986, 989 (4th Cir. 1992), affg. T.C. Memo. 1990-618; Petzoldt v. Commissioner, 92 T.C. 661, 687 (1989); Schellenbarg v. Commissioner, 31 T.C. 1269, 1277 (1959), affd. in part and revd. and remanded in part on another issue 283 F.2d 871 (6th Cir. 1960).

In order to prove that petitioner received income and did not report it on his income tax returns, respondent called seven witnesses: Barry Sharrow, Richard Eberli, Dexter Duncan, Dale Rutz, Tim Earle, Gordon Anderson, and Gerald Latter. Each of these witnesses credibly testified to purchasing computers or computer parts from petitioner and to paying for them either with cash or with checks not made payable to PAC. Those who paid by check credibly testified that petitioner told them either to leave the payee line blank or to enter petitioner's name on the payee line. Respondent established that the payments made by these customers were not reported on petitioner's or PAC's income tax returns.

Having established the existence of unreported income (and the inaccuracy of petitioner's books and records), respondent is given substantial latitude in choosing an appropriate method to reconstruct petitioner's income. One reconstruction method we have repeatedly accepted is the bank deposits method. As we recognized in Zuckerman v. Commissioner, T.C. Memo. 1997-21:

Use of the bank deposits method for reconstructing income is well established. <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992); <u>Estate of Mason v. Commissioner</u>, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Under the bank deposits method there is a rebuttable presumption that all funds deposited to a taxpayer's bank account constitute taxable income. <u>Price v. United States</u>, 335 F.2d 671, 677 (5th Cir. 1964); <u>Haque Estate v. Commissioner</u>, 132 F.2d 775, 777-778 (2d Cir. 1943), affg. 45 B.T.A. 104 (1941); <u>DiLeo v. Commissioner</u>, <u>supra</u> at 868. The Commissioner must take into account any nontaxable sources of deposits of which she is aware in determining the portion of the deposits that represent taxable income, but she is not required to trace deposits to their source. <u>Petzoldt v. Commissioner</u>, <u>supra</u> 695-696; <u>Estate of Mason v. Commissioner</u>, <u>supra</u> at 657.

In the case at hand, respondent used the bank deposits method to reconstruct petitioner's income, doing so in very conservative fashion. In connection with the criminal case against petitioner, Special Agent Bricker had obtained copies of petitioner's bank records. Agent Bricker sent letters to each of the drawers on the checks deposited to petitioner's bank account requesting information regarding (1) the nature of the payment, and (2) whether the drawers had any records of their dealings with petitioner. Agent Bricker sent out 685 letters to the drawers of more than $900,000 in identifiable checks deposited to petitioner's bank account in 1988, 1989, and 1990. Agent Bricker received 322 responses to his letters (a response rate of approximately 47 percent), 266 of which (approximately 82 percent of the responses) identified their checks as payments made for the purchase of computers or computer-related devices.

Revenue Agent Oertel compared the data obtained by Agent Bricker against petitioner's and PAC's bank records to determine whether the sales had been reported as income on either petitioner's or PAC's Federal income tax returns.  Agent Oertel prepared a detailed line-item analysis of petitioner's bank records.  Respondent's analysis of the evidence left no doubt that petitioner had received substantial amounts of income that were not reported on his income tax returns.  Petitioner offered no credible explanation for the omitted income.

Respondent took a very conservative approach to the determination of petitioner's omitted income.  Unless Agent Oertel could tell from specific information contained on the check (such as a reference to the purchase of computer products written on the check itself), Agent Oertel treated all the deposits for which Agent Bricker did not receive a response (totaling $769,612[3]) as nontaxable to petitioner.  In addition, petitioner had $695,910[4] in deposits to his checking account that neither Agent Bricker nor Agent Oertel could identify, either because the bank did not provide sufficient information, because the information provided was not legible, or because the check did not indicate the name and address of the drawer.  Agent

---

[3]This consists of $459,677.02 for 1988, $150,338.50 for 1989, and $159,596.09 for 1990.

[4]This consists of $352,975.57 in 1988, $137,509.13 in 1989, and $205,425.77 for 1990.

Oertel treated all these unidentified deposits as nontaxable to petitioner. Agent Oertel also cross-checked against PAC's corporate books all items treated as taxable to petitioner. Agent Oertel treated as nontaxable any items deposited to petitioner's account that had been included in PAC's income.[5]

Using this very conservative approach, Agent Oertel determined that petitioner deposited to his bank account during the years in issue $122,599 in funds[6] from the sale of computer equipment, none of which was recognized on petitioner's or PAC's income tax returns.

In addition to the taxable income determined from responses to Agent Bricker's letters, respondent treated a total of $23,129[7] deposited into petitioner's bank account as taxable because Agent Oertel could tell from references on the checks that the payments were on account of computer equipment purchases. Respondent introduced into evidence copies of the documents showing the references upon which Agent Oertel relied. As determined by respondent, the references specifically relate

---

[5]Respondent did not analyze whether amounts included in PAC's income that had been paid to petitioner would be taxable to petitioner as, for example, constructive dividends.

[6]This consists of $48,956.84 in 1988, $30,586.19 in 1989, and $43,055.89 in 1990.

[7]This consists of $9,841.60 in 1988, $5,505.50 in 1989, and $7,782.00 in 1990.

to computer purchases.  Petitioner offered no evidence to put in doubt the correctness of respondent's determinations.

Finally, respondent established that petitioner received additional unreported income that was not deposited to petitioner's or PAC's bank accounts.  A number of PAC's customers, in response to Agent Bricker's mailing, provided evidence of additional computer purchases from PAC, the income from which was not recognized on PAC's or petitioner's tax returns and was not traceable to petitioner's or PAC's bank accounts.  Many of these were cash sales.  Petitioner received additional unreported income of $37,733.38 for 1988, $20,319.27 for 1989, and $16,417.87 in 1990 on account of these unrecorded sales.

In sum, Agent Oertel established that petitioner received and failed to report income of $220,198.54 for the 3 years in issue, consisting of $96,531.82[8] in 1988, $56,410.96[9] in 1989,

---

[8]This consists of $48,956.84 identified using the deposit method from responses to Agent Bricker's mailing, $9,841.60 identified using the deposit method from indicia on the checks, and $37,733.38 identified from the specific evidence provided by PAC customers in response to Agent Bricker's mailing.

[9]This consists of $30,586.19 identified using the deposit method from responses to Agent Bricker's mailing, $5,505.50 identified using the deposit method from indicia on the checks, and $20,319.27 identified from the specific evidence provided by PAC customers in response to Agent Bricker's mailing.

and \$67,255.76[10] in 1990.  Agent Oertel's testimony and analysis leave no doubt that petitioner omitted from income the full amounts identified as taxable to him by respondent for the years in issue, as adjusted by respondent's concession for 1990, as described below.

Once the Commissioner makes a prima facie case of unreported income using the bank deposits and specific identification methods, and has made a determination in the notice of deficiency, the taxpayer bears the burden of proving that the deposits identified by the Commissioner as unreported income do not in fact represent unreported income.  See DiLeo v. Commissioner, 96 T.C. 858, 869 (1991) ("petitioners, not the Government, bear the burden of proving that respondent's determination of underreported income, computed using the bank deposits method of reconstructing income, is incorrect"), affd. 959 F.2d 16 (2d Cir. 1992).

At no time during the trial did petitioner attempt to introduce any evidence to show:  (1) That the unreported income identified by respondent had in fact never been received by him, (2) that the unreported income identified by respondent had in

---

[10]This consists of \$43,055.89 identified using the deposit method from responses to Agent Bricker's mailing, \$7,782 identified using the deposit method from indicia on the checks, and \$16,417.87 identified from the specific evidence provided by PAC customers in response to Agent Bricker's mailing.

fact been reported, or (3) that the unreported income identified by respondent was somehow tax exempt.[11]

Agent Oertel obtained additional information of unreported income for 1988 and 1989 after the notice of deficiency was mailed. With respect to 1988 and 1989, respondent established that petitioner had unreported income of $96,531.82 and $56,410.96, respectively, but had only determined in the notice of deficiency unreported income of $93,374 and $52,543, respectively. Respondent does not seek to increase the amount

---

[11]Instead of addressing the unreported income issues identified by respondent, petitioner attempted (unsuccessfully) to elicit testimony from the computer equipment purchasers that the purchased equipment may have belonged to a Mr. Hu, rather than to petitioner or PAC. According to the testimony, Mr. Hu was a former employee of PAC who spoke little English and assisted petitioner in assembling and repairing computers. The witnesses all testified that they bought the equipment from PAC's store, received a PAC receipt, and dealt only with petitioner. Petitioner offered no evidence that Mr. Hu owned the equipment, and he failed to explain how Mr. Hu's alleged ownership of the equipment would be relevant; after all, the purchase price ended up in petitioner's bank account.

Petitioner also attempted to introduce into evidence an affidavit allegedly signed by Mr. Hu, in which Mr. Hu allegedly took responsibility for the deposit of PAC's money into petitioner's bank account. We sustained respondent's objection to the admission of the affidavit into evidence as hearsay. We also fail to see how the affidavit would be relevant. Even if Mr. Hu made the deposits to petitioner's bank account, the testimony of the witnesses left no doubt that petitioner was in charge, that petitioner orchestrated the scheme to avoid detection of his unreported income--by requesting cash payments, by requesting that checks be made out in his name or with the payee left blank so that he could insert his name, and by falsely causing indications on the check to reflect loans rather than computer sales--and was fully aware of both the deposits and his failure to report the income.

determined in the notice of deficiency to reflect the proof of additional amounts introduced into evidence at trial: "To the extent that Revenue Agent Oertel's analysis exceeds the amounts asserted in the Statutory Notice of Deficiency for 1988 and 1989, respondent will not seek an increased deficiency." In addition, Agent Oertel identified several items that were double counted in the notice of deficiency for 1990. For 1990, Agent Oertel's analysis shows a lower deficiency of $67,255 than was set forth in the statutory notice of deficiency of $78,253. In his trial brief and at trial, respondent conceded the excess: "For 1990, inasmuch as Revenue Agent Oertel's analysis shows less unreported income than the Statutory Notice of Deficiency, respondent has conceded the excess." We accept respondent's concession for 1990.

Respondent's deficiency determinations excluded substantial additional amounts of unreported income that are apparent from the record. Respondent determined the deficiencies using only the amounts concretely proved to be unreported income on the basis of his single information request. The evidence suggests that petitioner received substantial additional amounts of unreported income. Respondent identified deposits of $769,612 made to petitioner's bank account for which the drawers of the checks did not respond to Agent Bricker's mailing, and an additional $695,910 in deposits made to petitioner's bank account

by payors who respondent could not identify from the information provided by petitioner's bank.

Given the percentage of responses to Agent Bricker's letter that showed unreported income from the sale of computer products and services (82 percent of those who responded stated that their payment was for PAC computer equipment and services, and none of this revenue was reported on petitioner's or PAC's Federal income tax returns), there is a high probability, amounting to more than mere suspicion, that a substantial proportion of the unidentified or unproven deposits also represent unreported taxable income. Petitioner offered no credible evidence (and maintained no credible records) as to the source or nature of those deposits.

Although it's not our job to tell respondent how to do his job, see United States v. Payner, 447 U.S. 727, 731, 737 (1980) (Burger, C.J., concurring), we observe that respondent established substantial amounts of unexplained deposits that were not included in the deficiency notice.[12]

We have affirmed determinations of unreported income under the bank deposits method where the Commissioner has offered no evidence as to the source of the deposits, requiring the Commissioner to show only that unexplained deposits were made to

[12]Our concerns are aggravated by the evidence in the record that during 2 of the taxable years in issue and the year following, petitioner purchased four parcels of real property for $1.925 million, making aggregate downpayments of $755,038. See supra note 2.

the taxpayer's bank account.  In <u>Parks v. Commissioner</u>, 94 T.C. 654, 658 (1990), we held:

> Contrary to petitioner's belief, the burden is upon petitioner to prove that respondent's determination of unreported income, computed using the cash deposits and expenditures method of reconstructing income, is incorrect. * * * [Citations omitted.]

Again, <u>id.</u> at 660, we held:

> Where a taxpayer provides respondent with no leads as to source, respondent is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the taxpayer. Moreover, where a taxpayer admits receipt of cash, respondent need not prove a likely source of resulting cash deposits or expenditures.  [Citations omitted.]

Accord <u>Hardy v. Commissioner</u>, 181 F.3d 1002, 1004-1005 (9th Cir. 1999) ("If the Commissioner introduces some evidence that the taxpayer received unreported income, the burden shifts to the taxpayer to show by a preponderance of the evidence that the deficiency was arbitrary or erroneous."), affg. T.C. Memo. 1997-97; <u>Clayton v. Commissioner</u>, 102 T.C. 632 (1994); <u>Kling v. Commissioner</u>, T.C. Memo. 2001-78 ("Absent some explanation, a taxpayer's bank deposits represent taxable income. * * *  The taxpayer has the burden of proving that the bank deposits came from a nontaxable source"); <u>Beck v. Commissioner</u>, T.C. Memo. 2001-270 ("Bank deposits are prima facie evidence of income"); <u>Kudo v. Commissioner</u>, T.C. Memo. 1998-404 (Commissioner not required to show link between deposits and taxable source of income), affd. 11 Fed. Appx. 864 (9th Cir. 2001).  These rules

recognize that the taxpayer is responsible for maintaining adequate books and records to explain the sources of his bank deposits.

If the taxpayer offers a possible nontaxable source for the deposits, the Commissioner must either negate the potential nontaxable source or connect the deposits with a likely source of taxable income. Kramer v. Commissioner, 389 F. 2d 236, 239 (7th Cir. 1968) (Commissioner not required to provide likely source if he proves that deposit was not from "cash hoard"), affg. T.C. Memo. 1966-234; Price v. Commissioner, T.C. Memo. 2001-307 ("If the taxpayer suggests a nontaxable source, the Commissioner must either connect the bank deposits to a likely source of taxable income or negate the nontaxable source alleged by the taxpayer."); Estate of Johnson v. Commissioner, T.C. Memo. 2001-182.

In cases such as the case at hand, governed by precedent from the Court of Appeals for the Ninth Circuit, if the Commissioner fails to prove that the taxpayer actually received income (such as, in the case at hand, by showing unexplained bank deposits), the Commissioner has the burden of proving a likely source of the allegedly unreported and reconstructed income. In Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977), the Court of Appeals ruled that no presumption of correctness would attach to a reconstruction of

hypothetical drug-dealing income where the Commissioner offered no proof either of income or of drug dealing.  However, if the Commissioner either establishes the identity of the specific income or proves the source of unreported income, the taxpayer has the burden of proving the Commissioner's determination incorrect.  See, e.g., Hardy v. Commissioner, supra at 1004-1005 (showing of unexplained bank deposits sufficient to shift burden to taxpayer); Palmer v. United States, 116 F.3d 1309 (9th Cir. 1997) (showing that expenditures exceeded reported income sufficient to shift burden); Roat v. Commissioner, 847 F.2d 1379 (9th Cir. 1988) (presumption of correctness applies where taxpayer admitted receiving income); Delaney v. Commissioner, 743 F.2d 670 (9th Cir. 1984) (presumption of correctness applies against taxpayer who admits owning asset allegedly purchased with unreported income), affg. T.C. Memo. 1982-666; United States v. Stonehill, 702 F.2d 1288 (9th Cir. 1983).

In the case at hand, respondent has shown through petitioner's bank records both the receipt of specific items of unreported income (the bank deposits) and their likely source (receipts from sales and repairs of computer equipment).[13]  In

---

[13]As explained supra p. 12, responses to Agent Bricker's mailing showed that petitioner received additional unreported income of $74,470.52 from cash sales during the years in issue. Respondent did not attempt to use statistical methods to estimate the amount of unreported cash sales that petitioner received from sources who did not respond to Agent Bricker's mailing.  For a

(continued...)

---

<sup></sup>[13](...continued)
discussion of the use of statistical methods in legal cases to extrapolate estimates from known samples, see United States v. Shonubi, 895 F. Supp. 460 (E.D. N.Y. 1995) (approving use of statistical methods to determine, based on a sample of four of the 103 balloons swallowed by defendant, that all 103 balloons contained heroin), revd. on other grounds 103 F.3d 1085 (2d Cir. 1997).

In the tax context, the Court of Appeals for the Ninth Circuit rejected the use of statistical methods to assess deficiencies against a restaurant for failing to withhold and pay sufficient employment taxes on its employees' tip income. Fior D'Italia, Inc. v. United States, 242 F.3d 844 (9th Cir. 2001), cert. granted 122 S. Ct. 865 (2002). However, the Court of Appeals distinguished the case before it from the presumption that would apply to the use of statistical methods to estimate the unreported tip income received by the employees themselves. The Court of Appeals cited with approval and distinguished the Tax Court's opinion in McQuatters v. Commissioner, T.C. Memo. 1973-240, which upheld the use of statistical methods to recreate the tip income received by waiters who failed to keep proper records:

> Because the employees should have maintained records of their income but failed to do so, it was deemed entirely appropriate to put the burden on them to prove that the IRS's estimate overstated their taxable income. * * *
>
> * * * the taxpayer in our case did not fail to satisfy a legal duty imposed on it by the Internal Revenue Code, and thus did not give the IRS just cause for resorting to an estimate in constructing its assessment. [Fior D'Italia, Inc. v. United States, supra at 848.]

In view of the complexity of using statistical methods to estimate unreported cash income that cannot be traced, we understand respondent's decision to focus on traceable deposits. However, respondent might well have required petitioner to explain the source of the remaining bank deposits, inasmuch as respondent would have been required to do no more than include the unexplained deposits in his determination, on the ground that the deposits were unexplained and similar to the other taxable

(continued...)

these circumstances, respondent might well have included in the deficiency determination[14] all the unexplained deposits and imposed on petitioner the burden of showing that the deposits were not unreported income.[15]

In view of the conservative approach taken by respondent, we have no hesitation in sustaining respondent's deficiency determinations, as adjusted to reflect respondent's concession for 1990.

Issue 2.  <u>Petitioner's Liability for Fraud Addition to Tax and Penalties</u>

For 1988, the civil fraud addition was set forth in section 6653(b).  It was moved in 1989, with some minor clarifying

---

[13](...continued)
deposits.

[14]If the Commissioner does not include unexplained deposits as unreported income in his deficiency determination, he may still raise the issue by answer, or with leave of court by amendment to answer.  The Commissioner initially bears the burden of proof in respect of new matters asserted in the answer, Rule 142(a)(1), but that burden is satisfied if the Commissioner establishes the existence of bank deposits and a potential taxable source, and the taxpayer fails to offer credible evidence of a nontaxable source, see <u>Hardy v. Commissioner</u>, 181 F.3d 1002 (9th Cir. 1999), affg. T.C. Memo. 1997-97.

[15]Petitioner stated in his pretrial memorandum:  "my CPA and attorney told me that I am very unlucky".  Although petitioner might consider himself unlucky because his returns were selected for examination in the "audit lottery", petitioner is very fortunate that respondent did not include in his deficiency determination, or in his answer:  (1) The remaining unexplained deposits, (2) estimates, using statistical methods, of other unreported cash receipts, or (3) amounts paid by the corporation to petitioner, as constructive dividends.

changes in language, to section 6663 and termed a "penalty". Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7721(a), (d), 103 Stat. 2395, 2400 ("effective for returns the due date for which (determined without regard to extensions) is after 12/31/89").

Under both these provisions, respondent must prove by clear and convincing evidence that some portion of the underpayment in petitioner's tax for each of the years in issue was due to fraud. Respondent is not required to prove the precise amount of the underpayment resulting from fraud, but only that some part of the underpayment is attributable thereto. See Otsuki v. Commissioner, 53 T.C. 96, 105 (1969). The burden then shifts to petitioner to show any portion of the underpayment that was not due to fraud. Sec. 6653(b)(2) (1988); sec. 6663(b).

For the purposes of the civil tax statutes, fraud is an intentional wrongdoing on the part of the taxpayer with the specific purpose of evading tax believed to be owed. See Powell v. Granquist, 252 F.2d 56 (9th Cir. 1958); Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. and remanding 40 B.T.A. 424 (1939). Negligence of a taxpayer, whether slight or gross, is not sufficient to prove fraud. See Mitchell v. Commissioner, supra at 310. To prove fraud, the Commissioner must show that the taxpayer intended to evade taxes believed to be owing by conduct intended to conceal, mislead, or

otherwise prevent the collection of taxes. See <u>Parks v. Commissioner</u>, 94 T.C. at 661.

The presence of fraud is a question of fact to be resolved upon consideration of the entire record. See <u>Recklitis v. Commissioner</u>, 91 T.C. 874, 909 (1988). Because direct proof of the taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence. See <u>Spies v. United States</u>, 317 U.S. 492 (1943); <u>Recklitis v. Commissioner</u>, <u>supra</u> at 910.

A taxpayer convicted of criminal tax evasion is collaterally estopped from denying liability for the civil fraud penalty. <u>Moore v. United States</u>, 360 F.2d 353 (4th Cir. 1965); <u>Zamzam v. Commissioner</u>, T.C. Memo. 2000-371. Therefore, petitioner, having been convicted of criminal tax evasion for 1988, is liable as a matter of law for the fraud addition for 1988. Respondent must prove fraud by clear and convincing evidence for 1989 and 1990.

Courts have developed a nonexclusive list of items of circumstantial evidence--often referred to as "badges of fraud"--that will support a finding of fraudulent intent. In <u>Bradford v. Commissioner</u>, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601, the Court of Appeals for the Ninth Circuit--to which an appeal of this case would lie--set forth the following indicia or "badges" of fraud: (1) Understatement of income; (2) maintenance of inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of

behavior; (5) concealment of assets; and (6) failure to cooperate with tax authorities.  The Court of Appeals also stated that the existence of the following facts additionally supports a finding of fraudulent intent:  (1) Dealing in cash to avoid scrutiny of finances, and (2) failing to make estimated tax payments.  See id. at 308.

We affirm respondent's determination of the fraud addition to tax and penalties.  Petitioner's conduct displays many of the "badges" of fraud.

As described in detail above, petitioner significantly understated income and maintained inadequate records to explain the nature and sources of his deposits.

Petitioner also provided implausible and inconsistent explanations of his deposits.  He lied to Agent Bricker during the criminal investigation, stating that not more than one or two checks for the purchase of computer equipment had been deposited into his personal account, and that any such checks deposited to his account would have been the result of a bank error.  In fact, as petitioner knew full well, hundreds of such checks had been deposited to his account.  Petitioner also lied when he testified that he did not tell customers to leave the payee lines blank, to make PAC checks payable to him, or to pay in cash.  Barry Sharrow, Richard Eberli, Dexter Duncan, Dale Rutz, and Tim Earle all testified that petitioner told them to leave the payee line

blank or to make their checks payable to petitioner. Mrs. Rutz and Messrs. Eberli and Latter testified that petitioner told them to pay in cash.

Petitioner also attempted to blame his fraud on his former employee, Mr. Hu, suggesting that it was Mr. Hu who deposited all those checks into petitioner's bank account. Petitioner also suggested to the customer/witnesses that they may have been buying computer products belonging to Mr. Hu rather than belonging to him or PAC. Petitioner's explanations were implausible and were an unsuccessful attempt to confuse the Court and to divert attention from his own fraudulent conduct.

Petitioner concealed computer sales by making sure that the sales were not reflected on PAC's books, by having the payments made in cash or by check made out to him personally, by indicating that the deposits related to loan repayments when he knew that they were for computer sales, and by carefully concealing the facts from his accountants.

Petitioner failed to cooperate with respondent's investigation; he refused to answer questions during the investigation, and he failed to respond to respondent's formal discovery requests in any meaningful way, even after being ordered by the Court to respond. Petitioner's conduct was not innocent. He fully understood his obligation to report sales on PAC's books and records. Petitioner's conduct evidences a course

of action consciously undertaken both to avoid taxation and to avoid detection.

Respondent has met his burden of showing by clear and convincing evidence that petitioner's understatements of income were due to fraud. Petitioner offered no credible evidence to show that any portion of the understatements was not due to fraud. We sustain respondent's determinations that petitioner is liable for the civil fraud addition to tax for 1988 and fraud penalties for 1989 and 1990.

To reflect the foregoing and respondent's concessions,

<u>Decision will be entered under Rule 155</u>.