13-4152-cr
*United States v. Valentino Anderson*

# In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM 2014
No. 13-4152-cr

UNITED STATES OF AMERICA
*Appellant,*

*v.*

VALENTINO ANDERSON,
*Appellee-Defendant*

————

Appeal from the United States District Court
for the District of Vermont.
No. 13 CR 24 — Christina Reiss, *Chief Judge.*

————

ARGUED: OCTOBER 1, 2014
DECIDED: NOVEMBER 24, 2014

————

Before: PARKER, LYNCH and CARNEY, *Circuit Judges.*

_____

Appeal from an order of the United States District Court for the District of Vermont (Reiss, *Chief Judge*), suppressing physical evidence seized from defendant Valentino Anderson's wife, Crystal Anderson. The district court held that admitting against Anderson in his narcotics trafficking prosecution cocaine base that his wife recovered from a body cavity and surrendered to the state police as a result of unconstitutional coercive tactics would violate Anderson's right to substantive due process. Accordingly, the court suppressed the evidence. Because Anderson cannot suppress evidence that was seized through an illegal search directed at another person, we reverse.

> CRAIG S. NOLAN, (Gregory L. Waples *on the brief*), *for* Tristram J. Coffin, United States Attorney, District of Vermont, Burlington, VT, *for Appellant*
>
> RICHARD C. BOTHFELD, Bothfeld & Volk P.C., Burlington, VT, *for Appellee-Defendant*

_____

BARRINGTON D. PARKER, CIRCUIT JUDGE:

The Government appeals from an order of the United States District Court for the District of Vermont (Reiss, *C.J.*) suppressing, on substantive due process grounds, drugs that had been secreted within the vagina of Crystal Anderson, the wife of defendant Valentino Anderson, and that she surrendered to Vermont state police officers after a lengthy custodial interrogation during which she was the subject of unconstitutional, coercive conduct. The

District Court held that, because the conduct of the Vermont state troopers vis-à-vis Mrs. Anderson was sufficiently outrageous, the drugs could not be admitted into evidence at Valentino Anderson's trial. The Government does not contest on appeal that the conduct of the Vermont state troopers violated Mrs. Anderson's substantive due process rights, but contends that Anderson cannot assert such a claim based on conduct directed solely at his wife. For the reasons that follow, we agree and we reverse.

## BACKGROUND

Evidence adduced during the suppression proceedings established the following. On October 30, 2012, the Vermont state police conducted a traffic stop of a vehicle that defendant Valentino Anderson was driving with his wife, Crystal Anderson, and another passenger named Kenneth Clark. The ostensible basis for the stop was that the vehicle's front headlights were not illuminated in violation of Vermont state law. Earlier that evening, Senior Trooper Michael Studin had received a call from a Massachusetts state trooper informing him that a suspicious vehicle was traveling north on Interstate 91. The Massachusetts state trooper described the vehicle for Studin and told him that the registered owner (Anderson) had numerous prior arrests, including ones for drugs and firearms. Studin then contacted Senior Trooper Max Trenosky to tell him that there was "a potential drug load coming up Interstate 91," and Trenosky stationed himself on Interstate 91 near the Vermont/Massachusetts border. *United States v. Anderson*, No. 5:13 Cr. 24, 2013 WL 5769976, at *2 (D.Vt. Oct. 24, 2013).

Approximately forty-five minutes later, Studin located the vehicle traveling north on Interstate 91, through Brattleboro, Vermont, and observed the vehicle exit the highway and pull into a

gas station.  When the vehicle subsequently left the gas station, Studin stopped the vehicle.  Trenosky arrived at the scene shortly thereafter.

When questioned, the three occupants offered differing accounts of their movements and of the purpose of their trip.  Anderson was required to leave the vehicle and, according to Studin, consented to be searched.  Studin questioned Anderson, who eventually told Studin that he and his wife had used drugs in the past and that she had "problems with heroin and crack cocaine." *Anderson*, 2013 WL 5769976, at *2.

Meanwhile, Trenosky interrogated and searched Clark and Mrs. Anderson, and Studin then sought and obtained Anderson's consent to search the vehicle.  Trenosky found drug paraphernalia in Mrs. Anderson's handbag and drug residue in a bag in the pocket of Anderson's jacket.  Studin placed Mrs. Anderson in handcuffs, telling her that "she was being detained for investigatory purposes," and asked her to sit in the front passenger seat of Trenosky's vehicle. *Anderson*, 2013 WL 5769976, at *3.  Another Vermont state police trooper then arrived at the scene with a search dog.  During an exterior search of Anderson's vehicle, the dog alerted to the presence of drugs and after a search of the front passenger seat where Mrs. Anderson had been sitting, the dog again alerted to the presence of narcotics.  Based on the reaction of the dog, the troopers apparently believed that Mrs. Anderson may have secreted drugs on her person.

Anderson and Clark were subsequently released, but the troopers detained Mrs. Anderson.  The troopers did not tell her that she had been placed under arrest.  They did, however, tell her that she was being taken to the state police barracks and that they

4

intended to apply for a warrant for a body cavity search. Mrs. Anderson informed the troopers that she knew her rights and that the officers had no grounds for obtaining such a warrant. At the barracks, Mrs. Anderson was handcuffed to a chair in the processing room while Studin contacted the state's attorney and applied for a warrant for a body cavity search. The state court judge denied the application. Both Studin and Trenosky were informed that their application had been denied, but they and the other troopers undertook to conceal this fact from Mrs. Anderson.

At some point, Studin and Trenosky were joined by a female officer, Aubrey Crowley. After Mrs. Anderson had been handcuffed to the chair for approximately three hours, Crowley approached her, asked if she needed water and told her, referring to the warrant, "just so you know, he's going to go see the judge right now and get that all signed off, alright?" *Anderson*, 2013 WL 5769976, at *4. The district court concluded that, prior to this conversation, Crowley presumably had learned that the warrant application had been denied and so her statement to Mrs. Anderson was false.

Another thirty minutes later, after Mrs. Anderson had been handcuffed to the chair for three and a half hours, Crowley returned to give her water and said, "[S]o we're going to be headed over to the hospital, okay?" *Anderson*, 2013 WL 5769976, at *4. After viewing the police videos of the processing room, the district court described Mrs. Anderson as appearing "disheveled, groggy and uncommunicative, hanging her head or turning away as Officer Crowley attempted to engage her in conversation. " *Id.* Crowley asked Mrs. Anderson if she wanted to share her story with Crowley specifically because Crowley was also "a girl" and because the other troopers could be "a little brusque" and "hard to talk to." *Id.* Mrs. Anderson again requested to see the warrant and indicated that she might talk if she saw a warrant. Mrs. Anderson asked Crowley why

she would not show her the warrant if the police officers were about to take her to the hospital where she would be forcibly searched. Crowley did not tell her the warrant had been denied.

After approximately four hours of detention, Crowley took Mrs. Anderson to a conference room in the barracks where Mrs. Anderson told Crowley: "[L]ike I said, you show me the warrant [or] there's no point" and again Crowley did not mention that the application had been denied. *Anderson*, 2013 WL 5769976, at \*5. Some time later, in the early morning of October 31, Trenosky came to join Crowley and Mrs. Anderson and (as he recounted) he "made small talk by bringing up the fact that her husband had a poor relationship with her as he threw her 'under the bus' roadside" and "that it speaks volumes about his character, how he left her and went back to Rutland." *Id.* Trenosky also told Mrs. Anderson that he was "disappointed" with her and that her relationship with her husband "must not be that good if he was willing to let her take responsibility for trafficking his drugs." *Id.*

Crowley brought the unsigned search warrant application into the room and Mrs. Anderson asked why the warrant had not been signed by the judge. She again said that if she saw a signed copy she might agree to speak with the officers. None of the officers told her that the judge had refused to sign the warrant and Trenosky "reiterated how poorly her husband treated her." *Anderson*, 2013 WL 5769976, at \*5. At that point, Mrs. Anderson began to cry and said that she was not willing to risk a lengthy period of incarceration to protect her husband. Then, Trenosky finally read Mrs. Anderson her *Miranda* warnings and asked if she would speak with him. She signed a waiver form at 4:22 a.m. on the morning of October 31, some six hours after she had been arrested.

Mrs. Anderson was then escorted back to the processing room and interviewed for another two hours by Trenosky and another unidentified police officer. She admitted that the drugs were concealed in her vagina. Trenosky told her that the "easiest way to do this" would be for her to remove the drugs in the presence of the female officer. *Anderson*, 2013 WL 5769976, at \*5. He also told her that "with the body warrant, it's very difficult for us to actually get it signed a lot of times, so a lot of times we ask for voluntary consent," but he still did not tell her that the warrant had been denied. *Id.* at \*5 n 4. Crowley then accompanied Mrs. Anderson to the bathroom where Mrs. Anderson recovered the drugs from a condom in her vagina and gave them to Crowley.

At this point, Trenosky told Mrs. Anderson, for the first time, that the state judge had denied their application for a search warrant. Trenosky then shared with Mrs. Anderson his modus operandi. He told her (as recorded in a videotape of Mrs. Anderson's detainment) that, as police officers: "[W]e don't necessarily have to tell you the truth one hundred percent of the time – Cuz that's our angle in law enforcement, ya know, I can, I can lie to you all day long, um and it's more of just I just want to make it clear that you don't feel coerced today, you don't feel like we did anything inappropriate or wrong." *See* ECF Dkt Entry No. 29 at 6 (citing Exhibit E at 0:20:27).

The Andersons were subsequently indicted on drug possession and conspiracy charges. After her indictment, Mrs. Anderson moved to suppress her post-arrest statements and the drugs from her vaginal cavity. She argued primarily that the police misconduct that led her to surrender the secreted drugs constituted an involuntary body cavity search and thus violated the Fourth Amendment, and that she had been arrested without probable

cause. Subsequently, she withdrew her motion, entered a plea of guilty and was sentenced to time served.

Anderson joined his wife's suppression motion and further argued that using the drug evidence against him would violate his right under the Fifth Amendment to substantive due process because the evidence was obtained through a "bad faith search" and as a consequence of police conduct that "shock[ed] the conscience." ECF Dkt. Entry No. 30.

The district court granted the motion.[1] *See Anderson*, 2013 WL 5769976. The court concluded that Anderson had standing to challenge the admissibility of the drugs obtained from his wife and that admitting the evidence would violate Anderson's substantive due process rights, because the evidence was obtained by law enforcement "conduct that shocks the conscience." *See Rochin v. California*, 342 U.S. 165, 172 (1952). The district court also found that the statements that Mrs. Anderson had made to the Vermont state troopers were involuntary and had been secured as a consequence of an array of constitutional violations.

Specifically, the district court found that Mrs. Anderson had been subjected to prolonged custodial interrogation without the benefit of *Miranda* warnings. Her statements were tainted by coercive police conduct, which included misrepresentations that her husband had incriminated her in drug trafficking and that she would be transported to a hospital where the drugs would be forcibly extracted from her body if she did not remove them herself. The district court also concluded that the police misconduct was

---

[1]As no testimony was taken at the suppression proceedings, the district court's findings of fact were derived from the affidavit of Trooper Studin and the Investigation Narrative of Trooper Trenosky, as well as three videotapes depicting portions of Mrs. Anderson's detention at the Vermont state police's Brattleboro barracks.

exacerbated by the lack of any exigency. Unlike her husband, who was not detained, Mrs. Anderson was not a known drug trafficker and the misconduct took place over a number of hours in the police barracks. These circumstances as well as what the court termed the "egregious" flouting of a judicial finding that no probable cause existed to search or continue to detain Mrs. Anderson—all amounted, the court found, to outrageous police conduct that violated due process. *Anderson*, 2013 WL 5769976, at \*12. Accordingly, the district court held that, the drug evidence obtained from Mrs. Anderson was "inadmissible for any purpose." *Id.*

On appeal, the Government does not contest that the conduct of the Vermont state police violated Mrs. Anderson's substantive due process rights.[2] But the Government contends that under *United States v. Payner*, 447 U.S. 727, 735-37 n.9 (1980), Anderson cannot base a substantive due process claim on what happened to his wife. We agree and we reverse.[3]

## DISCUSSION

The dispositive issue presented by this appeal is whether Anderson may suppress on substantive due process grounds evidence obtained as a consequence of an illegal search of his wife rather than himself. It is well settled that he may not do so based on the Fourth Amendment because "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those

---

[2] "The United States does not challenge the district court's holding that the police violated Crystal Anderson's substantive due process rights, and it is not using the evidence obtained from Crystal Anderson to prosecute her." Gov't App. Br. at 3.

[3] When reviewing a motion to suppress evidence, "we review the district court's factual findings for clear error and its conclusions of law *de novo*." *United States v. Awadallah*, 349 F.3d 42, 71 (2d Cir. 2003) (quotation marks omitted).

who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States*, 394 U.S. 165, 171-72 (1969). "Coconspirators and codefendants have been accorded no special standing." *Id.* at 172. The district court recognized as much but granted Anderson's suppression motion based on a conclusion that the police misconduct was sufficiently egregious that the admission of evidence obtained through such conduct at trial would violate Anderson's rights to substantive due process.

A defendant can raise a substantive due process claim if outrageous government conduct was directed at him. *See United States v. Salerno*, 481 U.S. 739, 746 (1987); *see also Rochin*, 342 U.S. at 169. But *Payner* bars such a claim when it is based on a "flagrantly illegal search" of the defendant's wife. 447 U.S. at 729. In *Payner*, the defendant objected to the introduction of documents obtained illegally from the briefcase of a third party bank officer. Like Anderson, he raised a substantive due process claim. The evidence had been stolen by an informant who, working with an Internal Revenue Service agent, broke into the bank officer's apartment and stole his briefcase, which contained records that the government needed to build its case. 447 U.S. at 729. The IRS agent then supervised the copying of approximately 400 documents taken from the briefcase, while a "lookout" observed the bank officer at dinner. When the bank officer left the restaurant, the lookout notified the informant and the briefcase was replaced. *Id.* at 730. The documents recovered from the briefcase ultimately led to the discovery of important incriminating evidence.

The lower court had held that the defendant did not have standing to assert that the theft of the briefcase and the subsequent illegal search violated the Fourth Amendment, but, under the inherent supervisory power of federal courts and the due process

clause, the illegally-seized evidence was not admissible. *United States v. Payner*, 434 F. Supp. 113, 129, 133-135 (N.D. Ohio 1977). Ultimately, the Supreme Court reversed. It agreed that the defendant did not have standing to invoke the Fourth Amendment's exclusionary rule, but went on to conclude that he also could not assert a substantive due process claim when his own property had not been subject to the illegal search. The Court stated:

> even if we assume that the unlawful . . . search was so outrageous as to offend fundamental 'canons of decency and fairness,' the fact remains that '[t]he limitations of the Due Process Clause . . . come into play only when the Government activity in question violates some protected right of the *defendant*.'

*Payner*, 447 U.S. at 737 n. 9 (quoting *Hampton v. United States*, 425 U.S. 484, 490 (1976) (plurality opinion) (internal citations omitted)).

Accordingly, on the facts before us, *Payner* precludes suppression, on substantive due process grounds, of physical evidence obtained through a flagrantly illegal search directed at someone other than the defendant. This is so notwithstanding the fact that the conduct of the Vermont state police was deceptive, coercive and illegal.

In holding that *Payner* precludes Anderson's claim, we need not decide whether physical evidence obtained through outrageous conduct – such as torture – inflicted on a third party may *never* be excluded on due process grounds. The Seventh Circuit has explained that "a violation of another person's [F]ifth [A]mendment

11

rights may rise to the level of a violation of [a defendant's] rights to a fair trial. Due Process is implicated when the government seeks a conviction through use of evidence obtained by extreme coercion or torture." *United States v. Chiavola*, 744 F.2d 1271, 1273 (7th Cir. 1984) (internal citation omitted). Significantly, neither *Payner* nor this case involved conduct, such as torture, so beyond the pale of civilized society that no court could countenance it.

This holding is in line with our sister circuits that have considered this issue. *See, e.g., United States v. Dyke*, 718 F.3d 1282, 1285, 1288 (10th Cir. 2013) (declining to "take sides" on the continuing viability of the outrageous conduct defense in light of *Payner*, but noting that since *Payner*, the Supreme Court has regularly "reminded us . . . that we are not to reverse convictions simply to punish bad behavior by governmental agents, but should do so only when the bad behavior precipitates serious prejudice to some recognized legal right of the particular defendant before us"); *United States v. Teague*, 469 F.3d 205, 210 (1st Cir. 2006) (rejecting, under *Payner,* defendant's claim that the use of evidence recovered through an illegal search of a third party's vehicle violated his due process rights); *United States v. Noriega*, 117 F.3d 1206, 1214 (11th Cir. 1997); *United States v. Valdovinos-Valdovinos*, 743 F.2d 1436, 1437-38 (9th Cir. 1984) (per curiam) ("*Hampton* and *Payner* preclude defendants from raising due process violations allegedly suffered by third parties [and because] [a]ny due process violations in the instant controversy involved the Fifth Amendment rights of the two illegal aliens," the defendant "lacked standing to challenge these alleged violations"); *see also United States v. Miceli,* 774 F. Supp. 760, 770 (W.D.N.Y. 1991) (following *Payner* and rejecting an outrageous misconduct defense where a government investigator seduced the defendant's ex-wife in order to gather incriminating information about the defendant, but noting that the "court would not hesitate to intervene if [the

investigator] had raped or otherwise abused [the ex-wife] in a single-minded effort to collect evidence of crime against the defendant").

Anderson also argues that the district court's supervisory power justifies its suppression of the unlawfully obtained evidence. *See, e.g., Elkins v. United States*, 364 U.S. 206, 223 (1960). The district court did not specifically rely on this power, but Anderson contends that this Court may nonetheless consider this issue, which is closely aligned with other issues he has argued and, in any event, is grounded in the record. *See International Ore & Fertilizer Corp. v. SGS Control Servs. Inc.*, 38 F.3d 1279, 1286 (2d Cir. 1994) ("[A]ppellee may seek to sustain a judgment on any grounds with support in the record.")

We address the issue but conclude that *Payner* also governs it. After holding that the defendant could not prevail on substantive due process grounds, the Supreme Court went on to "conclude that the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court." *Payner*, 447 U.S at 735. The Supreme Court also noted that it "has never held . . . that the supervisory power authorizes suppression of evidence obtained from third parties in violation of Constitution, statute or rule. The supervisory power merely permits federal courts to supervise the administration of criminal justice among the parties before the bar." *Id.* at 735 n.7 (internal quotation marks and citation omitted). *See Noriega*, 117 F.3d at 1214 ("[a] reasonable reading of *Payner* . . . compels the conclusion that a court may not exercise its supervisory power to dismiss an indictment if the government treated third parties unconscionably, where, as here, such an approach would circumvent the Supreme Court's limiting construction of the Fifth Amendment").

13

## CONCLUSION

For the foregoing reasons, we **REVERSE** the October 24, 2013, order of the District Court.